## COX v. MONTAGUE.

(Circuit Court of Appeals, Sixth Circuit. February 2, 1897.)

### No. 428.

1. INSOLVENT NATIONAL BANK—LIABILITY OF TRANSFERROR OF STOCK.

It is not necessary, in order to hold liable for an assessment upon the share-holders of an insolvent national bank one who has transferred his stock to an irresponsible person, to show that the transferror had actual knowledge of the insolvency of the bank at the time of the transfer, but it is sufficient if he had good ground to apprehend its failure, and made the transfer with intent to relieve himself from individual liability.

2. WITNESSES—PRIVILEGED COMMUNICATIONS.

Upon the trial of a suit brought by the receiver of an insolvent national bank to collect an assessment from one who had transferred his stock, a let-ter written by the defendant to a bank examiner, in reply to an inquiry about the bank, in which defendant admits his transfer of his stock when the bank was embarrassed, is not a privileged communication, though the bank ex-aminer's letter, to which it is a reply, is marked "Confidential."

Appeal from the Circuit Court of the United States for the South-ern Division of the Eastern District of Tennessee.

The appellant sued in the court below to set aside the transfer by the appellee, defendant below, to his sister, Clara W. Montague, of 60 shares, of the par value of $100 each, of the capital stock of the First National Bank of Johnson City, and to recover against the appellee the sum of $6,000, with interest, being the assessment levied on said stock by the comptroller of currency in order to pay the debts of said bank. The transfer was made on the 28th of April, 1894. It is averred in the bill that the bank was then insolvent, as was well known to the defendant, T. G. Montague, which fact was the principal inducement to the transfer; that Montague was the president of the First National Bank of Chat-tanooga, a correspondent of the Johnson City Bank, and that he was familiar with the condition of its affairs; that the Johnson City Bank had long been in failing circumstances, and that the Chattanooga Bank had frequently supplied it with funds to prevent its suspension.

It is further averred that Clara W. Montague, who was made a defendant, was insolvent at the time of the transfer of the stock and at the date of the filing of the bill, and that the transfer to her was made with intent on the part of T. G. Montague to avoid individual liability as a shareholder, and was voluntary and fraudulent. Clara W. Montague made no defense to the bill, which, as to her, was taken for confessed. T. G. Montague, in his answer, admitted that he had held the 60 shares of stock, and that he transferred them to his sister. He denied that the bank was insolvent at the time of the transfer, or that he had informa-tion which would lead him to suspect its insolvency, but admitted that the Chat-tanooga Bank did extend aid and credit to the Johnson City Bank; also that the transfer of stock to his sister was voluntary, but denied that it was fraudulent, averring that it was prompted by and founded upon the consideration of love and affection.

The bank of Johnson City was twice examined by J. M. Miller as a national bank examiner; first on January 22, 1894, and second and lastly on or about November 9, 1894, when he closed the bank. That examination disclosed the in-solvency of the bank, its liabilities being about $100,000, and "its solvent assets" about $40,000. The examiner testifies that the condition of the bank at that time had not, apparently, much changed since his examination in January, 1894. There had in the meantime been a loss of $3,000 by the bank in one transaction, and between $1,000 and $2,000 on another; but he testifies that he is unable to state how long before the bank was closed it was in fact insolvent, but gives it as his opinion that it was so in January, 1894, and in April, 1894,

Attached as exhibits to the depositions of the complainant are letters from the defendant, T. G. Montague, addressed to the president of the Johnson City Bank; also one letter addressed by him to the examiner. From these letters it appears

that Montague, on the 28th of January, 1893, sent $800 to the Johnson City Bank; on the 20th of May, 1893, $5,000, in silver, for which exchange was to be furnished by the Johnson City Bank. On the 18th of July of that year he wrote, calling attention to the fact that the overdraft of the Johnson City Bank on the Chattanooga Bank, which on the 10th of July was $3,183, had increased to $5,036, and complains that no substantial collateral had been sent. From a letter written by him on the 29th of July it appears that the Johnson City Bank had mailed them $2,000 of business paper for discount. Montague said: "You appear to think we are a currency factory. On the 30th of June you overdrew $1,500 'for a few days at the outside.' Your account has been overdrawn continuously since. On the 17th of July you wrote us that your overdraft might be increased to $4,400, which would be paid in a few days. After sending the collateral, you continue to overdraw until the amount last night was $8,070." He refers to New York exchange received that day which reduced the overdraft to $6,070, but complains that at the same time they sent for $2,000 additional, which he declined to furnish, and calls for the money that was then charged up against the bank, and desires that it be paid as rapidly as possible. On the 31st of July he telegraphed that he that day shipped to the Johnson City Bank $2,000 in currency. On the 3d of August, 1893, he made another remittance of $2,000 in currency. On the 7th, by arrangement with the president of the Johnson City Bank, he expressed $2,000 silver and $3,000 exchange to New York City for account of the Johnson City Bank; making the advance to the Johnson City Bank then outstanding, $10,500. Referring to telegram asking for $1,000 more, he declines to furnish it, stating that the president had assured him that the bank would get along without additional assistance until what was already owing should be repaid. On the 10th of August he telegraphs to the president of the Johnson City Bank that he had deposited in New York $2,000. On the 11th he telegraphs and writes declining an application for a further advance. On the 12th he writes to the president of the Johnson City Bank, calling attention to the fact that the account of the bank was then overdrawn $3,400, and "the $5,000 loan for five days due and unpaid. I do not see any help for you. You do not seem to have gotten help in New York to keep up. We cannot send you any money. We have all that we can do to meet our own demands, unless you can pay us the balance of account and send us good paper to abundantly cover it." On the 21st of August, 1893, he complains by letter that the Johnson City Bank had made a draft on them for $500, to be paid in cash, adding: "We need very much the amount of your note which is overdue, and cannot pay checks when you have no funds to your credit. We wish to be accommodating, and do everything possible, but we cannot manufacture money." On the 31st of January, 1894, he writes to the president of the Johnson City Bank that the bank's account was overdrawn $5,200, that they had collateral for only $4,800, and therefore declines to make remittances to New York, as requested. On the 4th of September, 1894, asks that the Johnson City Bank reduce its overdraft, which then remained at $5,070. On the 7th of November, 1894, John M. Miller, Jr., examiner, wrote to Montague a letter marked "Confidential," inquiring concerning the business character and reputation of the president of the Johnson City Bank. To that letter, Montague, after answering the inquiries of Miller, added, "I became alarmed after seeing several of his reports as made to the comptroller showing his cash often below the required reserve, and disposed of my stock some time ago." Referring to Crandall's transaction, he wrote that he had thought that "he was anxious to do more business than the capital stock of his bank would warrant," and that "his capital was largely tied up by loans to parties who could not pay; that any sudden demand upon him for $1,000 or $2,000 required that he should get assistance from other banks to tide over"; and stated that he knew "that the failure of railroads and land enterprises in and around Johnson City crippled a large majority of the business men, and that they had been very hard up for the past three years. We hoped from month to month that he would realize on enough of this suspended paper to carry his bank through successfully."

The deposition of Miss Montague was taken by complainant. She states that she first learned from T. G. Montague that the stock had been transferred to her, and that he told her of it, she thought, in May or June of 1894, adding that it might have been in April, and at that time he turned over the new certificates of stock to her. She never asked for the stock; it was a present to her. He had

never, before telling her of the transfer, had any conversation with her about it. At first she declined to answer whether she had any property in Hamilton county, Tenn., but afterwards admitted that she had not. Said that she did own property somewhere. She thought that that property was in her own name, but did not know whether it was or not. It was not in the state of Tennessee, and she owned no property in that state. T. G. Montague was not a witness. James E. Brading, who was cashier of the Johnson City Bank, was called as a witness for defendant. He testified that on the 27th of April, 1894, R. S. Boyd, who was understood to be insolvent, but nevertheless was said to have good credit in the Jonesborough Bank, offered 50 cents on the dollar in cash for $1,000 of T. G. Montague's stock in the Johnson City Bank, with the understanding that $2,000 or $3,000 more could probably be handled at the same figure, and possibly the entire $6,000. This offer was communicated in writing to Montague, and by him declined.

Brading testifies that he thinks he communicated by writing Boyd's offer on the 27th of April, the date that it was made. It does not appear to have reached Montague before his letter of the following day, directing the issue of certificates to his sister, had been posted; nor does it appear that Montague gave any reason for declining to accept the offer excepting that which he avers in his answer, which was not called for under oath, but was sworn to. It appears also by the testimony of Brading that at the date of the transfer by Montague of his stock to his sister the general estimate at Johnson City of the value of the stock was from 50 to 75 cents.

Robert Pritchard, for appellant.

Thomas McDermott, for appellee.

Before TAFT and LURTON, Circuit Judges, and SAGE, District Judge.

SAGE, District Judge, after stating the facts as above, delivered the opinion of the court.

Montague's letters and telegrams to the Johnson City Bank make it evident that he knew months before he made the transfer of his stock to his sister that the bank was in imminent danger of insolvency. That transfer was not only without consideration, but, at the time, without even the knowledge of his sister. It was made on the 28th of April, 1894. She testified that, according to her recollection, she was informed of it in May or June, 1894, but added that it might have been in April. Her testimony as to her financial condition is altogether unsatisfactory. Her unwillingness at first to give any testimony on the subject was enough to warrant the most unfavorable inferences. At last she admitted that she had no property in Tennessee. Said that she did own some property somewhere, which she thought was in her own name, but did not know whether it was or not. That she did not take sufficient interest in the case to make any answer, and that she suffered decree against her by default, strongly indicates that she was utterly irresponsible financially, or that she had herself no faith in the integrity of the transaction. She was not even a witness of her own volition, or upon the call of the defendant, but was subpœnaed and examined on behalf of the complainant. Montague himself was not a witness in the case,—a circumstance which, in view of the evidence against him, is of great weight. A like circumstance in Bowden v. Johnson, 107 U. S. 251, 2 Sup. Ct. 246, cited later in this opinion, was so characterized by the supreme

court. In his answer Montague set up that a few days prior to the transfer of his stock he was offered by a responsible party in Johnson City 50 cents on the dollar for a portion thereof, with the assurance that a great part, if not all, of the residue would be taken at the same price. That averment undoubtedly relates to the offer above referred to, for it does not appear that any other was made. It does not appear from the evidence that the person who made the offer was insolvent, although one person is said to have declared that he had good credit in the Jonesborough Bank. The offer was for $1,000 of the stock at 50 cents on the dollar. It was not made until the 27th of April. Montague's letter inclosing to the bank the certificates for his shares with an order for their transfer to his sister was dated and mailed the next day, April 28, 1894, at which time the offer to him could not have been received. That fact alone is sufficient explanation of his declination. It may have been also that, while he had abundant reason to apprehend the failure of the bank, he still hoped that it would pull through, in which event the stock could be transferred to him by his sister. If there were any doubt as to the motive which induced him to make the transfer, it would be removed by his letter under date of November 8, 1894, to the bank examiner, who had on the previous day written him a confidential letter inquiring concerning the president of the Johnson City Bank, and asking for the name of some thoroughly reliable and well-posted person at or near Johnson City to consult "on credits," etc. The learned judge who heard the case below was of opinion that this letter could not be properly used against the defendant, because it was a confidential letter, and voluntarily turned over by the bank examiner to the receiver. We do not concur in that view. The letter was in no sense a privileged communication, and the mere fact that it was in answer to a letter marked "Confidential" cannot, in our opinion, be regarded as a legal objection to its use as testimony. The authorities are the other way. In Wilson v. Rastall, 4 Term. R. 753, Lord Kenyon said:

"But if a friend could not reveal what was imparted to him in confidence, what is to become of many cases even affecting life, e. g., Doctor Ratcliff's Case, 9 State Tr. 582. And if the privilege now claimed extended to all cases and persons, Lord W. Russell died by the hands of an assassin, and not by the hands of the law, for his friend, Lord Howard, was permitted to give evidence of confidential conversations between them." 3 State Tr. 715.

In the same case, Buller, J., said that it was indeed hard in many cases to compel a friend to disclose a confidential conversation, but that the privilege must be confined to the cases to which it extends. In Loyd v. Freshfield, 2 Car. & P. 329, it was held that a banker is bound to disclose a communication, however confidential.

The letter to Montague was written by Miller in his official capacity, and signed by him as examiner. Montague's answer is addressed to the examiner in his official capacity. It may well be doubted whether such letter, whatever may have been the intention of the writer, can be regarded as confidential in the sense in which the court below regarded it, and in the sense which counsel for ap-

pellee seek to apply here. Besides, the information called for by the examiner was with reference to the president of the Johnson City Bank. Montague's answer volunteered, in addition, among other things, this very significant statement respecting the Johnson City Bank: "I became alarmed after seeing several of his reports as made to the comptroller, showing his cash often below the required reserve, and disposed of my stock some time ago." We know of no reason founded upon any principle of the law of evidence why this statement, which is a distinct and unequivocal admission of a fact, should be excluded. It tells the reason for the transfer of the stock in plain, direct words, which cannot be mistaken. This statement, taken in connection with the letters first above referred to, the testimony of Clara W. Montague, and the omission of defendant, Montague, to testify as a witness for himself in answer to the evidence against him, brings the case clearly within the rule stated in Bowden v. Johnson, 107 U. S. 261, 2 Sup. Ct. 254, that:

"Where the transferror, possessed of information showing that there is good ground to apprehend the failure of the bank, colludes and combines, as in this case, with an irresponsible transferee, with the design of substituting the latter in his place, and of thus leaving no one with any ability to respond for the individual liability imposed by the statute, in respect of the shares of stock transferred, the transaction will be decreed to be a fraud on the creditors, and he will be held to the same liability to the creditors as before the transfer. He will be still regarded as a shareholder quoad the creditors, although he may be able to show that there was a full or a partial consideration for the transfer as between him and the transferee."

The rule does not require proof that the transferror had actual knowledge of the insolvency of the bank, and that the transfer was made with a purpose to avoid individual liability. It is enough if the transferror had "good ground to apprehend the failure of the bank," and made the transfer to an irresponsible person, with intent to relieve himself from individual liability. Proof of actual knowledge of the insolvency of the bank was not made in Stuart v. Hayden, 18 C. C. A. 618, 72 Fed. 402, but the court of appeals of the Eighth circuit held the transferror liable. In Foster v. Lincoln, 74 Fed. 382, the defendant was president of the National Bank of Lyndon, Vt., and held 25 shares of stock in the First National Bank of Deming, N. M., which telegraphed to the Lyndon Bank, also a stockholder, for $5,000, to be sent by telegraph, for its aid. Within a week afterwards defendant made a voluntary transfer of his stock to his children, all of whom were financially irresponsible. The facts above stated were put in evidence, and it was shown, in addition, that the telegram for aid, when it was received, came to the knowledge of the defendant, who was sued to enforce his individual liability as a stockholder. That was all the evidence against him. The court regarded the telegram, which was received and came to defendant's knowledge six days before the transfer of his stock, as sufficient warning to him of the straits of the bank, and entered decree for the complainant. That case was not so strong for the complainant as is this case. There the defendant was a witness. Here the defendant was silent, and, al-

78 F.—54

though the transfer was voluntary, and made to his own sister, without her knowledge, she being financially irresponsible, and so little interested in the result as to make no defense, he declined to be a witness, made no explanation, and rested solely upon the contention that the complainant had not succeeded in making specific proof of the insolvency of the bank at the date of the transfer of the stock; and that, if the bank was then insolvent, it was not proven that he knew it or had notice of any other facts from which such knowledge could be inferred. That the contention is not well founded is apparent from what has been already expressed in this opinion. The appellant is entitled to decree as prayed in the bill. The decree below will be reversed, with instructions to enter a decree in accordance with this opinion.