McDONALD, RECEIVER, *v.* DEWEY.

DEWEY *v.* McDONALD, RECEIVER.

APPEAL AND CROSS APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

Nos. 220, 530. Argued April 11, 12, 1906.—Decided May 28, 1906.

An officer of a national bank owning stock therein knowing that it was insolvent, although it did not actually fail for two years after the first transfer, transferred stock at various times to one who merely acted as his agent and who absolutely transferred a part thereof to various people of doubtful financial responsibility, all transfers being forthwith made on the books of the bank; after the failure an assessment was levied by the comptroller and the receiver sued the original owner for the assessment on all of the shares originally owned by him. *Held*, that:

The gist of the shareholders' liability is the fraud implied in selling with notice of insolvency and with intent to evade the double liability imposed by § 5139, Rev. Stat.

The fact that the sale is made to an insolvent buyer is additional evidence of fraudulent intent but not sufficient to constitute fraud unless as in this case with notice of the bank's insolvency.

While a shareholder selling with notice of the bank's insolvency may defend against a claim of double liability by showing that the vendee is solvent, and the creditors therefore are not affected by the sale, the

burden of proof is on him to show such solvency, and that burden is not sustained when, as in this case, it does not satisfactorily appear that, a decree for the amount of the assessment could have been collected by ordinary process of law.

A shareholder who has transferred his stock to a mere agent is liable for the full amount of the assessment on the stock so transferred standing in the agent's name at the time of the failure; but when he has absolutely transferred stock prior to the failure with knowledge of the bank's insolvency to persons financially unable to respond to the assessment and those transfers have been made on the books of the bank, he is liable only for such amount of the assessment as may be necessary to satisfy creditors at the time of the transfer.

THE first of these cases was an appeal from a decree of the Circuit Court of Appeals, rendered in a case wherein John W. McDonald, receiver of the First National Bank of Orleans, Nebraska, was complainant, and Charles P. Dewey and others were defendants, reversing a decree of the Circuit Court for the Northern District of Illinois, and remanding the case to that court with directions to enter a decree against Dewey for his full assessment on 25 shares of stock of the First National Bank, and for interest thereon. The second case is a cross appeal by Chauncey Dewey and his co-executor from the same decree.

Charles P. Dewey having died pending the litigation, the suits were revived in the name of Chauncey Dewey and Charles T. Killen, executors of his will.

The original was a bill in equity to enforce an assessment of $86 a share on 105 shares of stock of the First National Bank of Orleans, Neb., which failed on May 20, 1897. These shares, having been originally owned by Charles P. Dewey, were sold by him in December, 1894, and in January, 1895. Eighty shares were duly transferred on the books of the bank within a few weeks after the sale. The remaining twenty-five shares had been previously transferred by Dewey to his agent, Frederick L. Jewett, who was admitted to be irresponsible, and stood on the books of the bank in the name of Jewett, when the bank went into the hands of a receiver, on May 20, 1897, although they had been sold by Dewey. The bill alleged that Hedlund, the original receiver (since superseded by McDonald,

the present receiver), was appointed and took possession on June 5, 1897, a fortnight after the failure of the bank; that on September 14, 1897, the Comptroller levied an assessment of $86 a share upon the capital stock; that on May 8, 1894, Charles P. Dewey was the owner of 105 shares of stock, and was registered as such; that the bank was then, and continuously remained, insolvent; that this insolvency was known to Dewey, who on that day, May 8, assigned 95 of these shares to the defendant Jewett, who was wholly irresponsible; that the transfer was colorable only, and made for the sole purpose of evading Dewey's liability as a stockholder; that Jewett thereafter, at various times, transferred 80 of the 95 shares to the several other defendants, and that on January 3, 1895, Dewey transferred his remaining 10 shares to Jewett, so that the bank failed said 105 shares were registered on the books of the bank in the names of the several transferees; that the several transfers were made at a time when the bank was insolvent, and known by Dewey to be so, for the purpose of evading liability for assessments, and to irresponsible persons.

The answer of Dewey contained a general denial of all material allegations, and set up that the transfers were outright and for the par value of the stock; that he had sold all his stock, and with the exception of the 25 shares, all transfers had been made on the books of the bank prior to its suspension.

The Circuit Court found that the sales of stock were all made through Jewett, who acted merely as the agent of Dewey and had no interest in the stock, but held it for Dewey in his name; that the bank failed about two years and five months after the sale by Dewey; that the bank was insolvent in December, 1894, and January, 1895, at the time Dewey sold the hundred and five shares, and that Dewey, who was vice president of the bank from 1892 to 1895, knew, or ought to have known, that fact; that three certificates, aggregating twenty-five shares, were not transferred on the books of the bank and still stood in the name of Jewett when the bank suspended; that the claims of the creditors of the bank, who were such when Dewey sold his

stock and remained such at the time of the failure, aggregated $11,839.15, of which, however, only $2,787.97 remained unsatisfied, and that of this the ratable share of Dewey was $585.48, for which sum a decree was rendered.

On appeal by the receiver to the Circuit Court of Appeals the decree of the Circuit Court was reversed and a new decree directed to be entered for the full amount of the assessment on the twenty-five shares standing in the name of Jewett at the time of the failure; that as to the eighty shares there could be no recovery, although the bank was insolvent at the time of the sale of the stock, and was known to be insolvent, and the transfer was made for the purpose of evading liability; but that there could be no recovery without proof of the additional fact that the several transferees were likewise insolvent; that as to the twenty-five shares Dewey remained liable, as he had not surrendered the certificate to the bank or given the officers such data as to enable them to make such transfer on its books. The case was remanded to the Circuit Court, with directions to render a decree against Dewey for his full assessment on twenty-five shares. From this decree both parties appealed to this court.

*Mr. Frank M. Hall,* with whom *Mr. Roscoe Pound* and *Mr. E. E. Prussing* were on the brief, for the receiver:

Upon proof of the insolvency of the bank at the time of the assignment, knowledge thereof by Dewey at that time, and that the purpose and intent of the transfer was to escape his liability upon the stock in an insolvent bank, a decree should be rendered for the full assessment on 105 shares. *Stuart* v. *Hayden,* 169 U. S. 1; *Earle* v. *Carson,* 188 U. S. 42; *National Bank* v. *Case,* 99 U. S. 632; *Bowden* v. *Johnson,* 107 U. S. 251.

Under a proper construction of the National Banking Act, Dewey's estate should be held for the full assessment on 105 shares, upon the facts found. The purpose of the statutory provision as to sale of the stock is to permit sale of stock in a solvent bank, not to permit evasion of liability upon stock in

a bank known to be insolvent, and the statute should be construed accordingly.

The word "transfer" in section 5139 means transfer in good faith; that good faith, in this connection, means that good faith which inheres in the ordinary sale of stocks and securities in the usual course of business, and that a transfer made in view of known insolvency, with a purpose of avoiding liability, is the sort of transfer excluded.

The liability of a stockholder in a national bank is contractual in its nature. *Richmond* v. *Irons*, 121 U. S. 27; *Concord Nat. Bank* v. *Hawkins*, 174 U. S. 365; *Whitman* v. *Oxford Nat. Bank*, 176 U. S. 559, 565; *Stuart* v. *Hayden*, 169 U. S. 1.

This court has held expressly that insolvency of a national bank changes at once the relation between stockholders and creditors. *McDonald* v. *Williams*, 174 U. S. 397.

The American rule as to the effect of transfers of stock in an insolvent corporation upon statutory stockholder's liability, is that such transfers will only divest the liability where made both in good faith and to solvent transferees, and that if made for the purpose and with the intent of avoiding liability upon the stock of a corporation known to be insolvent, the assignor remains liable. See *National Bank* v. *Case* and *Bowden* v. *Johnson, supra.*

The general rule is, undoubtedly, that a stockholder may freely transfer his shares to any person capable of acquiring them and thus substitute the latter as a member of the corporation in his stead. This rule, however, which permits a transfer of a liability, without the concurrence of those for whose benefit the liability exists, is anomalous, and rests upon special reasons, which are the measure of its extent. *National Carriage Co.* v. *Story Commercial Co.*, 111 California, 537.

The ordinary run of transfers made to avoid liability are, for obvious reasons, made to insolvent or irresponsible transferees. Hence many text-writers and many courts have coupled the two propositions—intent to avoid liability and insolvency of the transferees. But it does not follow from this

not unnatural juxtaposition of these propositions that both of these elements are essential in order to hold the transferrer, and must co-exist with insolvency of the corporation before he can be held liable. On the contrary, a detailed examination of the long list of cases in which this question has been before the courts of this country, will show these significant facts:

In substantially every case in which courts have held that a transfer of stock would divest the liability, they have qualified this statement by the proviso that the transfer must be in good faith. *Moss* v. *Oakley,* 2 Hill (N. Y.), 265; *Tucker* v. *Gilman,* 121 N. Y. 189; *Rochester & Kettle Falls Land Co.* v. *Raymond,* 158 N. Y. 576; *Middletown Bank* v. *Magill,* 33 Connecticut, 28, 70; *Aultman's Appeal,* 98 Pa. St. 505, 517; *Harpold* v. *Strobart,* 46 Ohio St. 397, 406; *Cole* v. *Adams,* 19 Tex. Civ. App. 507; *Stewart* v. *Walla Walla Co.,* 1 Washington, 521. In those cases in which intent to evade liability and insolvency on the part of the transferees co-existed, the courts have uniformly insisted upon the former as the material and important element. *Scofield* v. *Twining,* 127 Fed. Rep. 486; *Ward* v. *Joslin,* 100 Fed. Rep. 676; *Foster* v. *Lincoln,* 79 Fed. Rep. 170; *Cox* v. *Montague,* 78 Fed. Rep. 845; *Miller* v. *Great Republic Ins. Co.,* 50 Missouri, 55; *Burt* v. *Real Estate Exchange,* 175 Pa. St. 619. It has been held in many cases, by courts of high authority, that there need not be both intent to escape liability and insolvency of the transferees, but that one of these, coupled with known insolvency of the corporation, is enough. These cases are of two types, those which hold the original stockholder liable upon proof of known insolvency of the corporation and insolvency of the transferees, alone, without regard to proof of the intent with which the transfer was made, and those which hold him liable by reason of the known insolvency of the corporation and intent to escape liability, alone, without regard to the financial condition of the transferees. Cases of the first type are: *National Carriage Co.* v. *Story & Isham Co.,* 111 California, 537; *Welch* v. *Sargent,* 127 California, 72.

Of course, a transfer to an insolvent with knowledge of in-

solvency of the corporation is in and of itself a fraud. Cases like *Anderson* v. *Philadelphia Warehouse Co.*, 111 U. S. 479, where pledgees, seeking to protect their claims, put the stock in the name of irresponsible trustees, are quite different. Such a transaction is no fraud, since the pledgee is merely interested to the extent of security.

Cases of the second type, holding that a transfer with knowledge of insolvency of the corporation, made for the purpose and with the intent to escape the impending stockholder's liability, will not divest such liability, without regard to the financial status of the transferees, are: *Marcy* v. *Clark*, 17 Massachusetts, 330; *McLaren* v. *Franciscus*, 43 Missouri, 452; *Provident Savings Inst.* v. *Skating & Bathing Rink*, 52 Missouri, 557; *Stewart.* v. *Printing & Publishing Co.*, 1 Washington, 521; *Sykes* v. *Holloway*, 81 Fed. Rep. 432.

The transfers being fraudulent and invalid when made, the assignor remained liable down to the failure, and should be held for the full amount of the assessment.

*Mr. William B. McIlvaine*, with whom *Mr. John P. Wilson* and *Mr. Nathan G. Moore* were on the brief, for Dewey et al.

The only question presented by the record in this case is whether a sale of stock in a national bank, in operation as a going concern, and made with actual or imputed knowledge of the bank's insolvency, is under all circumstances voidable by the receiver.

There was no finding by the Circuit Court that the sale by Dewey was made in bad faith to avoid liability as a stockholder. This was a contested proposition, and if appellant was not satisfied with the court's ruling thereon, he should have brought the matter to the attention of the Court of Appeals in assignments of error. The Circuit Court expressly found that there was no evidence tending to show any fraud upon the creditors. This was equivalent to a finding that there was no bad faith or fraudulent intent.

The receiver was evidently satisfied that the concurrence of

the two facts, namely: the insolvency of the bank and the seller's knowledge thereof, was sufficient to charge Dewey with liability, regardless of whether his sale was made in good or in bad faith.

A sale of stock in a going bank, with actual or imputed knowledge of the insolvency of the bank, can only be avoided if it results in injury to creditors. *Earle* v. *Carson,* 188 U. S. 42; *Brunswick Terminal Co.* v. *National Bank of Baltimore,* 192 U. S. 386; *Richmond* v. *Irons,* 121 U. S. 27; *Bowden* v. *Johnson,* 107 U. S. 251; *Anderson* v. *Philadelphia Warehouse Co.,* 111 U. S. 479; *Robinson* v. *Southern Nat'l Bank,* 180 U. S. 295; *Sykes* v. *Holloway,* 81 Fed. Rep. 434; *Clarke* v. *White,* 12 Pet. 178; *Ming* v. *Woolfolk,* 116 U. S. 599.

The record fails to establish that Dewey knew or ought to have known of the alleged insolvency of the bank or that the bank was solvent at the time of his transfers of stock. If Dewey did not know of the alleged insolvency of the bank, then his sale of the 80 shares out and out, in good faith, clearly relieved him from any further liability thereon. *Earle* v. *Carson, supra.*

We are entitled to be heard in this court in support of the judgment of the lower court without assignments or cross error. *The Stephen Morgan,* 94 U. S. 599; and that the judgment was right upon any ground disclosed by the record. *Ridings* v. *Johnson,* 128 U. S. 212–218; 3 Ency. of Pleading & Practice, 372.

Insolvency is that condition of affairs in which a merchant or business man is unable to meet his obligations as they mature in the usual course of business. An act of insolvency takes place when this condition is demonstrated and the person has actually failed to meet some of his obligations. *Dodge* v. *Martin,* 17 Fed. Rep. 660; *Buchanan* v. *Smith,* 16 Wall. 277.

Although the liabilities of a corporation may greatly exceed its assets, it is not insolvent in such sense that its assets become a trust fund for *pro rata* distribution among its creditors, so long as it continues to be a going concern, and conducts its

business in the ordinary way.   *Comfort* v. *McTeer*, 7 Lea, 652, 660; *Publishing Co.* v. *Wheel Co.*, 95 Tennessee, 634.

Insolvency expresses the inability of a party to pay his debts as they become due in the ordinary course of business.   *Toof* v. *Martin*, 13 Wall. 47.

Mere inadequacy of assets of a bank to pay its debts is not insolvency; the true definition of insolvency is failure and consequent suspension of business.   *Earle* v. *Carson*, 188 U. S. 42.

Dewey was liable in any event only for his pro rata share of the debts of the bank existing at the time when he transferred his stock and which remained unpaid at the time of the failure.

We contend that after a stockholder has sold his stock out and out, and has had it transferred upon the books of the bank, so as to give notice to the world that he is no longer connected with the bank, he should be relieved from liability for debts incurred by the bank thereafter.   The statute is susceptible of this construction.   *Lantry* v. *Wallace*, 182 U. S. 536; *Waite* v. *Dawley*, 94 U. S. 527;   Cook on Stock and Stockholders, § 261.

If a creditor of a bank uses ordinary diligence, he can always ascertain who the shareholders are before he extends credit to the bank.   If he does not use such ordinary diligence, and extends credit upon an indefinite idea that there are shareholders who can be made to respond for his claim, can he subsequently look to shareholders who had previously sold their stock out and out by a *bona fide* transfer and had the sale registered on the bank's books?

The exact question involved here has been decided by the Supreme Court of Ohio, and upon a statute substantially similar to section 5151 of the National Banking Act.   See Rev. Stat. Ohio, § 3258;   *Peter* v. *Union Mfg. Co.*, 56 Ohio St. 181.

In another line of cases this court has held that only creditors who may be presumed to have extended credit to a corporation on the faith of an increase of stock or other stock liability, are entitled to base claims thereon.   See *Coit* v. *Gold Amalgamating Co.*, 119 U. S. 343; *Bank of Ft. Madison* v. *Alden*, 129 U. S.

372; *Handley* v. *Stutz*, 139 U. S. 417.    See also·*Stufflebeam* v. *De Lashmutt*, 83 Fed. Rep..449.

· Stockholders will be assessed ratably only for debts existing while they held the stock. *Young* v. *Wemple*, 36 Fed. Rep. 354.

Pledgees of stock may take stock in the name of an irresponsible party without in any way indicating that the stock is held as collateral and for the express purpose of avoiding liability. *Anderson* v. *Philadelphia Warehouse Co.*, 111 U. S. 479; *Rankin* v. *Fidelity Trust Co.*, 189 U. S. 242.

Mr.·Justice Brown, after making the foregoing statement, delivered the opinion of the court.

Three sections of the National Bank Act, ·which are printed in the margin,[1] are pertinent in connection with the leading questions involved in this case.

---

[1] Sec. 5139. The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and transferable· on the books of the association in such manner as may be prescribed in the by-laws or articles of association.    Every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares; and no change shall be made in the articles of association by which the rights, remedies, or security of the existing creditors of the association shall be impaired.

(The shares of this Nebraska bank were transferable only on the books of the bank, in person or by attorney, on surrender of the certificate that represented the shares proposed to be transferred.)

Sec. 5210. The president and cashier of every national banking ·association shall cause to be kept at all times a full and correct list of the names and residences of all the shareholders in the association, and the number of shares held by each, in the office where its business is transacted.    Such list shall be subject to the inspection of all the shareholders and creditors of the association, and the officers authorized to assess taxes under state authority, during business hours of each day in which business may be legally transacted.    A copy of such list, on the first Monday of July of each year, verified by the oath of such president or cashier, shall be transmitted to the Comptroller of the Currency.

Sec. 5151. The shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for an-

That the transfer of stock in corporations, even when in failing circumstances, should not be unduly impeded, is essential not only to the prosperity of such corporations and the value of their stock, but to the interest of stockholders who may desire for legitimate reasons to change their investments or to raise money for debts incurred outside the business of such corporation. *Bank* v. *Lanier*, 11 Wall. 369, 377. At the same time the frequency with which such transfers are made for the purpose of evading the double liability imposed by the National Banking Act, has given rise to a large amount of litigation turning upon their legality. In this connection certain propositions have been laid down by so many courts and in so many cases that they may be regarded as fundamental principles of law applicable to all cases of this character.

(1) That a party, who by way of pledge or collateral security for a loan of money, accepts stock of a national bank and puts his name on the registry as owner, incurs an immediate liability as a stockholder, and cannot relieve himself therefrom by making a colorable transfer of his stock to another person for his own benefit, as was done by the sale to Jewett in this case. *National Bank* v. *Case*, 99 U. S. 628; *Marcy* v. *Clark*, 17 Massachusetts, 329; *Nathan* v. *Whitlock*, 9 Paige, 152; Cook on Stockholders, § 263.

(2) The same result follows if the stockholder, knowing, or having good reason to know, the insolvency of the bank, colludes with an irresponsible person with design to substitute the latter in his place, and thus escape individual liability, and transfers his stock to such person. It is immaterial in such case that he may be able to show a full or partial consideration for the transfer as between himself and the transferee. *Bowden* v. *Johnson*, 107 U. S. 251.

Upon the other hand, in *Whitney* v. *Butler*, 118 U. S. 655, certain stockholders employed an auctioneer to sell their shares

---

other, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares;   .  .  .         \

at public auction. They were bidden in by a purchaser who paid the auctioneer for them and received from him the certificate of stock with a power of attorney to transfer the same in blank. The auctioneer paid the money to the original owner of stock, but no formal transfer was made on the books of the bank. Shortly afterwards the bank became insolvent and went into the hands of a receiver, who made an assessment upon the original stockholders. We held that the responsibility of the stockholders ceased upon the surrender of the certificate to the bank, and the delivery to its president of a power of attorney to transfer the stock on the books of the bank. The controlling considerations were the good faith of the stockholders in making the sale, believing the bank to be solvent, and the fact that they had done all that they could reasonably be expected to do to make a valid sale of the stock and a transfer of the certificate on the stock register.

Under the English law a shareholder may transfer his shares to an irresponsible party for a nominal consideration, though the sole purpose of the transfer be to escape liability, provided the transfer be out and out, and not merely colorable or collusive, with a secret trust attached. Under such circumstances the person making the transfer is released from liability, both as to corporate creditors and the other shareholders. Cook on Stockholders, § 266; 2 Morawetz on Private Corporations, § 859.

The law is quite different in this country. At the same time the original stockholder cannot be held liable, unless the bank were practically insolvent at the time the transfer was made, and its condition was known or ought to have been known to the stockholder making the transfer. If the bank were in fact solvent and able to pay its debts as they matured when the transfer was made, the creditors having ample security in the solvency of the bank, have no special interest in knowing who the stockholders are, since their only recourse to them would be in the remote contingency of the insolvency of the bank. The transferrer can only be held liable if the bank be insolvent, and such insolvency be known, or ought to have been known,

to him from his relations to the bank, since the transfer is *prima facie* valid, and shifts to the transferee the burden of the responsibility, which can be laid upon the original stockholder only in case of bad faith, or evidence of a purpose to evade liability.

This bad faith may be shown by the fact that the bank was known to him to be insolvent; but notwithstanding this the transfer would be valid if made to a person of known financial responsibility, since the creditors could not suffer by the substitution of one solvent stockholder in place of another. The Court of Appeals, however, went further and held that the transfer would be valid unless made to an irresponsible person unable to respond to an assessment, whose financial condition was known, or ought to have been known, to him.

There is no such limitation intimated in the case of *Pauly* v. *State Loan & Trust Co.*, 165 U. S. 606, which involved a question as to the liability of a pledgee, but in which certain rules were stated, p. 619, as to the liability of shareholders, one of which was "that if the real owner of the shares transfers them to another person, or causes them to be placed on the books of the association in the name of another person, with the intent simply to evade the responsibility imposed by section 5151 on shareholders of national banking associations, such owner may be treated, for the purposes of that section, as a shareholder and liable as therein prescribed." The case, however, is not directly in point.

The most pertinent in this connection is that of *Stuart* v. *Hayden,* 169 U. S. 1. In that case, Stuart, being an owner of one hundred shares of stock in a national bank, a director of the bank, and a member of its finance committee, purchased certain real property of Gruetter and Joers, and as a consideration assumed a mortgage debt, turned over his stock in the bank as of the value of $18,000, delivered to them the certificate of the shares and paid the balance of the agreed price in cash.

These certificates of stock were returned to the bank and new certificates issued to Gruetter and Joers, to whom Stuart rep-

resented that the bank was in a solvent and prosperous condition. The Circuit Court found that such representation was false to the knowledge of Stuart, and made for the purpose of inducing them to purchase the stock, and of evading and escaping his liability as a shareholder for his assessment thereon. Upon this state of facts Stuart was held liable to the receiver as the holder and owner of these shares.

The principal inquiry was whether Stuart transferred his stock to escape the liability imposed by the statute, his contention being that, if the transfer were absolute and to persons who were at the time solvent and able to respond to an assessment upon the shares, the motive with which the transfer was made was of no consequence.

In answer to this it was said by Mr. Justice Harlan (pp. 7, 8):

"There is no case in which this court has held that the intent with which the shareholder got rid of his stock was of no consequence; certainly, no case in which the intent was held to be immaterial, when coupled with knowledge or reasonable belief upon the part of the transferrer that the bank was insolvent or in a failing condition.

*    *    *    *    *    *·    *    *

"One who holds such shares—the bank being at the time insolvent—cannot escape the individual liability imposed by the statute by transferring his stock with intent simply to avoid that liability, knowing or having reason to believe, at the time of the transfer on the books of the bank that it is insolvent or about to fail. A transfer with such intent and under such circumstances, is a fraud upon the creditors of the bank, and may be treated by the receiver as inoperative between the transferrer and himself, and the former held liable as a shareholder without reference to the financial condition of the transferee."

The court found upon the facts (p. 14) "that Stuart, with knowledge of the insolvency of the bank, or at all events with such knowledge of the facts as reasonably justified the belief that insolvency existed or was impending, sold and transferred his stock with the intent to escape individual liability,    .   .   .

and the bank having been in fact insolvent at the time of the transfer of his stock—which fact is not disputed—he remained, notwithstanding such transfer, and as between the receiver and himself, a shareholder, subject to the individual liability imposed by section 5151." Although it was alleged in the bill by the receiver that Gruetter and Joers were at the time of the transfer pecuniarily irresponsible, there was no finding to that effect, and in treating of the liability of Stuart no stress was laid upon their financial condition, but the case was disposed of as one of bad faith on Stuart's part in transferring the shares at a time when he knew the bank to be insolvent. There is certainly nothing in this case to justify the inference that the receiver was bound in making out his case to establish the fact that the transferee was insolvent, and was known to the stockholder to be so when he transferred his stock.

In *Matteson* v. *Dent*, 176 U. S. 521, the stockholder, while the stock was yet owned by him and stood registered in his name, died intestate, and the stock was distributed to the widow and heirs by decree of the Probate Court. Shortly thereafter the bank became insolvent and the receiver brought suit against the widow and children for an assessment. The defendants were held to be liable upon the ground that the obligation of a subscriber of stock is contractual in its nature, and is not extinguished by death, but, like any other contract obligation, survives and is enforceable against the estate of the stockholder, notwithstanding that the estate of the decedent had been settled and fully administered according to law, and that the insolvency of the bank occurred after the death of the intestate, citing *Richmond* v. *Irons*, 121 U. S. 27. It is true that the case did not involve the question here presented, but in delivering the opinion the prior cases of *National Bank* v. *Case*, 99 U. S. 628, and *Bowden* v. *Johnson*, 107 U. S. 251, were cited in support of the proposition, treated as elementary, that "where a transfer has been fraudulently or collusively made to avoid an obligation to pay assessments, such transfer will be disregarded, and the real owner be held liable." (p. 531).

Much stress is laid, in the opinion of the Court of Appeals, upon the case of *Earle* v. *Carson,* 188 U. S. 42, supposed to lend countenance to the doctrine that the receiver is bound, as part of his case, to establish the fact that the transferee was insolvent and known to the transferrer to be so at the time of the transfer. The defense was that, prior to the suspension of the bank, the defendant had in good faith sold the stock standing in her name for the full market price, which had been paid her; that she had delivered up to the bank her stock certificate, with a power of attorney to make the transfer, and requested that the stock be transferred; that the officer of the bank said the transfer would be made, but it seems that the officer had failed to discharge that duty; that as the defendant had done everything which the law required her to do to secure the transfer, she had ceased to be a stockholder and was not responsible. It was alleged as error that the trial court refused to instruct the jury that the sale of the stock, though lawful in every other respect, could not be so treated if it were found that at the time of the sale the reserve of the bank were, to the knowledge of the defendant, below the limit fixed by law (p. 44). This refusal was held not to be error. "Certainly," said Mr. Justice White in the opinion (p. 46), "it cannot in reason be said that the power would exist to sell stock like any other personal property if before the power could be exercised the seller must examine the affairs of the bank, marshal its assets and liabilities in order to form an accurate judgment as to the precise condition of the bank."

In discussing the question in regard to the validity of the transfer, it was said (p. 49) that "the exercise of the power to transfer stock in a national bank is controlled by the rules of good faith applicable to other contracts. The qualification just stated gives no support to the proposition that where a sale of stock in a national bank is made in good faith, nevertheless the consequences of the sale are avoided if subsequently it developed that the bank was insolvent at the time of the transfer, in the sense that its assets were then unequal to the ·

discharge of its liabilities, when such fact was unknown to the seller of the stock at the time of the sale."

The argument was made (p. 54) that as the "person to whom the stock was sold was insolvent, and hence unable to respond to the double liability, the sale was void, although the fact of such insolvency of the buyer was unknown to the seller." This was held to be unsound, "since it but insists that the validity of the sale of the stock is to be tested, not by the good faith of the seller, but upon the unknown financial condition of the buyer." We find nothing in this case which impugns in any degree the authority of the prior cases, or holds that the validity of the sale is to be gauged by the financial condition of the transferee, or the knowledge of that condition by the transferrer.

1. We think it a proper deduction from the prior cases, and such we hold to be the law, that the gist of the liability is the fraud implied in selling, with notice of the insolvency of the bank and with intent to evade the double liability imposed upon the stockholder by the National Banking Act. In short, the question of liability is largely determinable by the presence or absence of an intent to evade liability. The fact that the sale was made to an insolvent buyer is doubtless additional evidence of the original fraudulent intent, but would not be in itself sufficient to constitute fraud without notice of the insolvency of the bank. The stockholder is not deprived of his right to sell his stock by the fact that the sale is made to an insolvent person, unless it be made with knowledge of the insolvency of the bank. This was practically the ruling in *Earle* v. *Carson*, in which we held that a *bona fide* sale would not be void, though the vendee were insolvent, if the fact of such insolvency were at the time unknown to the seller. The case of *Earle* v. *Carson*, so far from lending countenance to the argument of the appellees, bears strongly in the opposite direction.

The solvency of the vendee, however, is pertinent in showing that no damage could have resulted to the creditors of the bank by the transfer. Though not a necessary part of the plaintiff's

case, it may be a complete defense, if it be shown that the sale, however fraudulent, was made to a vendee who was as able to respond to the double liability as was the vendor. The proposition that the executors are not responsible because the sales were made to solvent vendees, being defensive in its character, the burden of proof was upon them. In this particular the case is not unlike that of an ordinary action upon a contract, where the plaintiff relies upon the contract and the breach, and sues for such damages as may be reasonably supposed to follow therefrom. But it may be shown in defense that no damages really resulted, as, for instance, in an action for services, that plaintiff might have obtained other employment at the same wages, or, in an action for a failure to deliver goods, that plaintiff might have gone into the market and purchased other goods at the same price at which the defendant had agreed to sell them. In such case defendant assumes the burden of proving that no damage in fact resulted. The argument in this case really is that the receiver was bound to show, not only that Dewey was guilty of fraud, but that damages necessarily resulted and that he knew that fact. The reply is that the fraud was consummated by the sale of the stock of a bank known to be insolvent, with intent to evade liability, and that the fraud is not less though the transferees happened to be solvent, but that their solvency may be proved to rebut the presumption that injury resulted to the creditors from the transfers.

While there is no express finding of the Court of Appeals (though there was in the Circuit Court) that Dewey knew, or should have known, of the insolvency of the bank at the time of the transfer, and that the transfer was made with the intent to evade his double liability as stockholder, the decree of both courts is based upon this assumption; and as stated in the dissenting opinion "that the final suspension of the bank, though it occurred two years and five months after Dewey's transfer of stock, is traceable, in the line of cause and effect, to the insolvency of the bank at the time of the trans

fer." We do not understand these facts to be seriously disputed.

In this connection it only remains to consider whether the transferees were financially responsible to the amount of the assessment. It is not necessary to show that they were persons of responsibility equal to that of the original stockholder. It is sufficient that they were responsible to the amount called for by the necessities of the case—in other words, in an amount sufficient to indicate that the creditors of the bank were not damnified by the change of ownership.

Although the evidence does not show affirmatively the insolvency of the ultimate transferees, it falls far short of showing that a decree against them for their assessment could be collected. Without going into details of the property of each one of the seven transferees, it is sufficient to say that they were either working on salaries, with no evidence of available property, outside of such salaries, or that their property consisted of incumbered real estate in Chicago of a largely speculative value; and that in some cases, at least, the shares were paid for in real estate conveyed for the purpose of getting rid of the property and avoiding the payment of interest on the incumbrances. There is no satisfactory evidence that a decree against any one of these parties for the amount of his assessment could have been collected by ordinary process of law.

2. But, except so far as the twenty-five shares held by Jewett as the agent of Dewey at the time of the failure, we think the executors should not be held liable to the creditors who became such after the transfer. The National Banking Act requires (Rev. Stat. § 5210) a list of the names and residences of all the shareholders, and the number of shares held by each to be kept in the banking house, subject to the inspection of all the shareholders and creditors of the association; and (sec. 5139), that every person becoming a shareholder by a transfer of shares to himself shall succeeed to all the rights and liabilities of the prior holder of such shares, and no change shall be made in the ar-

ticles of association by which the rights, remedies or securities of the *existing creditors* of the association shall be impaired.

The object of this legislation is evidently to apprise persons dealing with the bank of the names of the shareholders, upon whom the double liability shall be imposed in case of the insolvency of the bank. In the event of such insolvency it is only existing creditors who can claim to have been damnified by a fraudulent transfer of shares. As to them such transfer is voidable. Subsequent creditors are apprised by the published list of the names of the shareholders, to whom transfers have been made, and of the persons to whom they may have recourse for the double liability. The injustice of holding a stockholder liable for an indefinite time in the future to creditors who may have become such years after he had parted with his stock, and who were apprised of the names of the stockholders by the published list, is too manifest to require an extended comment. We are only applying to this case by analogy the ordinary rule of the common law, that a voluntary deed by a person heavily indebted is fraudulent and void as to prior creditors merely upon the ground that he was so indebted, but as to subsequent creditors is only void upon evidence that the deed was made in contemplation of future indebtedness. *Sexton* v. *Wheaton*, 8 Wheat. 229; *Schreyer* v. *Scott*, 134 U. S. 405; *Ridgeway* v. *Underwood*, 4 Wash. C. C. 129, 137; *Bennett* v. *Bedford Bank*, 11 Massachusetts, 421.

This was the interpretation given to a similar statute by the Supreme Court of Ohio in *Peter* v. *Union Mfg. Co.*, 56 Ohio St. 181, 204 It is true that in Ohio a stockholder cannot escape liability to existing creditors by a transfer of his stock, however *bona fide* such transfer may be. But we do not see how that affects the ruling in the *Peter* case, that he does not continue liable as to future creditors.

The case of *Bowden* v. *Johnson*, 107 U. S. 251, turned upon the question of the fraud in a certain transfer of stock, the conclusion being that such transfer was fraudulent, and that the original owner continued liable to the creditors of the bank.

The question as to whether such liability was limited to existing creditors or extended to future creditors was not touched upon in the opinion of the court, but as the insolvency of the bank seems to have occurred soon after the fraudulent transfer was made, it is improbable that any future creditors existed.

There are, undoubtedly, cases in which we have used the general expression that in the event of a fraudulent transfer of stock the stockholder remains liable to the creditors of the bank, but in none of them were we called upon to discriminate between existing and subsequent creditors, since as a rule the insolvency of the bank followed soon after the transfer, and the distinction was not called to our attention by counsel.

It results that there must be a decree affirming the decree of the Circuit Court of Appeals so far as it holds Dewey liable for his full assessment on the twenty-five shares standing in Jewett's name, and reversing in so far as it exonerated his estate from assessment upon the remaining shares, to such amount as is necessary to satisfy the creditors existing at the time the transfer of the stock was made, and that the cause be remanded to the Circuit Court for the Northern District of Illinois for further proceedings consistent with this opinion.

Mr. Justice White, with whom concur Mr. Justice McKenna and Mr. Justice Day, dissenting.

To make clear the reasons for my dissent I briefly recapitulate the facts, the issues and the matters decided.

As a result of the failure in May, 1897, of the First National Bank of Orleans, Nebraska, the Comptroller appointed a receiver and subsequently levied an assessment of $86 a share to make good a deficiency of assets required to enable the payment of the creditors of the bank existing at the date of the failure.

In May, 1894, Dewey was the registered owner of 105 shares of the stock of the bank. In that month and year he assigned 95 of these shares to Jewett and they were transferred on the

stock register in the name of Jewett. Jewett then transferred on the stock register 80 of these shares to six other persons, Jewett thus remaining the registered holder of but 15 out of the 95 shares transferred to him by Dewey. Subsequently Dewey transferred on the stock register the remaining 10 of the original 105 shares to Jewett. At the time, therefore, of the failure of the bank the 105 shares originally owned by Dewey had been put out of his name and stood on the stock register of the bank as follows: 25 shares in the name of Jewett and 80 shares in various proportions in the names of the six persons to whom Jewett had transferred them.

The object of the bill is to hold Dewey liable on the 105 shares for the assessment levied by the Comptroller. Questions of fact and of law are involved. The first are, At the time of the failure of the bank did the 105 shares of stock stand in the name of the agent of Dewey, or if not, did they stand in the name of irresponsible persons to whom Dewey, with the knowledge of the insolvency of the bank and to escape liability, transferred the stock? And the question of law is, If the stock was still Dewey's, or if it was transferred by him, as stated, is he liable for the assessment or for any part thereof?

The court now determines both questions of fact against Dewey. In other words, the court holds that Dewey was the owner of the 25 shares standing in the name of Jewett, because Jewett received the transfer merely as the agent of Dewey and never became the owner of the stock. As to the 80 shares standing in the names of the six persons to whom Jewett transferred them, the court holds that they were transferred by Dewey to his agent Jewett with knowledge of the insolvency and to avoid the statutory liability, and to carry out this purpose were transferred by Jewett as his (Dewey's) agent, into the names of six irresponsible persons. The questions of fact being thus decided against Dewey, the proposition of law is in substance decided in his favor. I say this because it is now held that Dewey is not liable, except as to the 25 shares, for the assessment of $86 a share to pay the debts of the bank

existing at the time of the failure, but only for such proportion of such assessment as may be required to pay such unsatisfied debts of the bank, if any there be, which were in existence at the several dates when the transfers of the 80 shares were made by Jewett as the agent of Dewey.

My dissent is constrained by a deep conviction of the unsoundness of the proposition now upheld exempting Dewey from liability, in respect to the 80 shares,-for the call made by the Comptroller to pay the debts of the bank existing at the time of the failure, and the decision that he is only liable for such sum as may be necessary to pay the unsatisfied debts, if any, which existed when the fraudulent transfer of the stock was made.

As it is given to me to see it, this ruling is both novel and dangerous and without the support of any administrative or judicial construction applied to the statute, since it was originally enacted, more than forty years ago. To me it moreover seems that the ruling is repugnant both to the text and spirit of the statute, considered as an original question, and is besides contrary to a line of adjudications of this and other Federal courts. My endeavor shall be briefly to state the reasons by which I am led to this conclusion.

It cannot be denied that from the date of the original enactment of the National Banking Act in 1863 to the present time the Comptroller of the Currency, in making an assessment under the law to pay the debts of a failed national bank, has always made such call upon the assumption that the stockholders who were liable for assessment were so liable ratably for the amount required to pay the debts of the bank existing at the time of the failure. Such also is the case viewed from the standpoint of judicial decisions, for, although in numerous cases in this court and many cases in the lower Federal courts for years and years, questions in every aspect have been considered concerning the liability of a stockholder in a national bank who, it was alleged, had transferred his stock in fraud of the statute, no case can be found where even a suggestion was

made by counsel or by the courts of the existence of the rule of limited liability which the court now upholds. In saying this I do not overlook the fact that the court in its opinion refers to an Ohio case *Peter* v. *Union Mfg. Co.*, 56 Ohio St. 181, as sustaining the doctrine which is now announced. That case, however, did not concern a national bank, but related to an Ohio corporation, and, as I shall hereafter endeavor to demonstrate, rested solely upon the provisions of the constitution and laws of the State of Ohio, which were not only peculiar to that State, but were directly in conflict with the principle of liability expressed in the acts of Congress concerning the responsibility of stockholders in national banks.

Whilst of course the absence during such a long period of time, in administrative execution and judicial exposition, of even a suggestion that the limitation of liability now sustained was warranted by the statute is not conclusive, it certainly is persuasive that if such a limitation can be evolved from the law it must be occult and strained, since it has been latent and undiscovered for forty years. But a consideration of the statute it seems to me will at once make clear the fact that the limitation now sanctioned has never before been intimated, because that limitation must have been considered to be repugnant to the text of the statute.

Both by the National Banking Act as originally adopted in 1863 and as reënacted in 1864, and as now embodied in section 5139 of the Revised Statutes, owners of stock in national banks were empowered to transfer that stock as personal property. The purpose of Congress to render this transfer effectual is evidenced by the omission in the reënactment in 1864 of a provision found in the act of 1863, which might have had the effect of limiting transfers. *Earle* v. *Carson*, 188 U. S. 42, 46. And, following the plain text of the act, it has not been questioned that creditors existing at the time a stockholder made and completed a lawful transfer of his stock had no right to complain or hold the outgoing stockholder for existing debts of the bank, since by the statute the result of such a transfer

was to sever all connection between such stockholder and the bank, wholly without reference to the consent of the then existing creditors, and to substitute the person to whom the valid and completed transfer had been made. Now, whilst it is true that the statute requires a registry of stockholders to be kept and transfers to be noted thereon, in view of the unlimited right of a stockholder to make a lawful transfer without the consent of the creditors existing at the time of the transfer, it cannot be said that the statute gave to the creditors a right to prevent transfers or presupposed that they would contract with the bank upon the faith of a particular state of the registry, when by the statute that registry could be changed by lawful transfers without the power of the creditor to complain. It is true also that the statute declares (Rev. Stat. § 5139) that when a lawful transfer is made the shareholder "shall succeed to all the rights and liabilities of the prior holder of such shares." But this does not imply that existing creditors have a contract right against the transferring stockholder, since the right of such stockholder to make a lawful transfer and substitute another for himself without the consent of the creditors is an affirmance instead of a negation of the absence of the contract relation between the transferring stockholder and then existing creditors. And this is emphasized, since the new stockholder becomes ratably liable not only for debts contracted after the transfer made to him but for all the prior unsatisfied debts. Of course by the statute as originally enacted and as now existing (Rev. Stat. § 5151), those who were stockholders in a national bank at the time of its failure are made equally and ratably liable to the amount of their stock for the debts of the bank then existing. But this provision does not destroy or impair the right to make a lawful transfer before the failure of a bank, since it only attaches the double liability to those who have not made a lawful transfer and who are in contemplation of law stockholders at the time of the failure. Harmonizing these two sections of the statute, they import the purpose to secure the great advantage result-

ing from the untrammelled power to make a lawful transfer of stock as pointed out by this court in *Earle* v. *Carson, supra,* and *First National Bank* v. *Lanier,* 11 Wall. 369, 377, and yet at the same time when failure ensues to give the then existing creditors the benefit of the double liability of the then existing stockholders.

And when the repeated adjudications of this court are considered to me it seems that they expound the text and spirit of the statute as above pointed out, and, therefore, the rule now announced cannot be consistently upheld without overthrowing those decisions and substituting a new statute. In *National Bank* v. *Case,* 99 U. S. 628 (decided in 1878), the principle controlling the question of the liability of a stockholder in a national bank who had made a fraudulent disposition of his stock was considered. On the one hand it was insisted that as the stockholder had a right to transfer his stock without the consent of then existing creditors of the bank, every "out and out" transfer, as it was termed, should be held to be efficacious to relieve from liability at the date of the failure. On the other hand it was contended that if a transfer was made with a knowledge of the insolvency of the bank and to escape the statutory liability, the stockholder remained a stockholder, and was, therefore, subject to the double liability. The latter contention was sustained. The court recognized the fact that in England, when a stockholder had a right to dispose of his stock at pleasure, the rule was that every out and out transfer which was not a mere sham severed the connection of the stockholder with the corporation, thus causing him to be no longer a stockholder and leaving him entirely free from liability. But the American rule was held to be different. Expounding that rule, it was declared that both in the case where a stockholder made a sham sale or transferred his stock to an irresponsible person, with knowledge of the insolvency of the bank, and for the purpose of escaping the statutory liability, the transferrer remained a stockholder for the purpose of the statutory double liability. In other words,

the court declared that in both such cases the transfer, in legal intendment, at the election of creditors would be held to be a mere simulation, leaving the stockholder, despite such transfer, continuously subject to his statutory liability.

Without attempting to review all of the many other cases decided by this court involving controversies on this subject, it may not be doubted that the substantial doctrine of the case just reviewed has been reiterated time and time again and is the settled law of this court.    Thus in *Bowden* v. *Johnson*, 107 U. S. 251, Johnson was the holder of stock in a national bank. On February 14, 1874, his stock was transferred on the books of the bank in the name of a Mrs. Valentine.    On May 26, 1874, more than three months after such transfer, the bank failed and the Comptroller made an assessment to pay the debts existing at the time of the failure, and the suit had for its object the enforcement of this assessment against Johnson. It was found that the transfer to Mrs. Valentine was not a sham, but that at the time it was made the bank was insolvent, that Johnson knew of the insolvency and transferred his stock to avoid liability and with the knowledge that Mrs. Valentine was irresponsible.    Coming to consider the contention, under these facts, that Johnson could not be held for the debts existing at the time of the failure, the court expressly reiterated the ruling in the *Case* case, held that a shareholder who made a fraudulent transfer of the kind under consideration continued liable as a stockholder, and the assessment which had been made by the Comptroller for the debts existing at the time of the failure was adjudged to be valid, although such failure happened months after the fraudulent transfer.    In the course of the opinion the court said (p. 261):

"But where the transferrer, possessed of information showing that there is good ground to apprehend the failure of the bank, colludes and combines, as in this case, with an irresponsible transferee, with the design of substituting the latter in his place, and of thus leaving no one with any ability to respond for the individual liability imposed by the statute, in respect

of the shares of stock transferred, the transaction will be decreed to be a fraud on the creditors, and he will be held to the same liability to the creditors as before the transfer. He will be still regarded as a shareholder *quoad* the creditors, although he may be able to show that there was a full or a partial consideration for the transfer, as between him and the transferee.

"The appellees contend that the statute does not admit of such a rule, because it declares that every person becoming a shareholder by transfer succeeds to all the liabilities of the prior holder, and that, therefore, the liabilities of the prior holder, as a stockholder, are extinguished by the transfer. But it was held by this court in *National Bank* v. *Case*, 99 U. S. 628, that a transfer on the books of the bank is not in all cases enough to extinguish liability. The court, in that case, defined as one limit of the right to transfer, that the transfer must be out and out, or one really transferring the ownership as between the parties to it. But there is nothing in the statute excluding, as another limit, that the transfer must not be to a person known to be irresponsible, and collusively made, with the intent of escaping liability, and defeating the rights given by statute to creditors. Mrs. Valentine might be liable as a shareholder succeeding to the liabilities of Johnson, because she has voluntarily assumed that position; but that is no reason why Johnson should not, at the election of creditors, still be treated as a shareholder, he having, to escape liability, perpetrated a fraud on the statute. This is the view enforced by the decision of the Chief Justice in *Davis* v. *Stevens*, 17 Blatchf. 259."

Again, in *Stuart* v. *Hayden*, 169 U. S. 1, where it was found that a transfer of stock in a national bank had been made with knowledge on the part of the transferrer of the insolvency of the bank, and to escape the double liability, the court, after approvingly citing the previous cases, said (p. 14):

"And the bank having been, in fact, insolvent at the time of the transfer of the stock—which fact is not disputed—he

(the transferrer) remained notwithstanding such transfer, as between the receiver and himself, a shareholder subject to the individual liability imposed by section 5151."

I need not stop to refer to the subsequent adjudications of this court which expressly reiterate the rulings just reviewed, since they are approvingly cited in the opinion of the court, and indeed are made the basis of the ruling. But to my mind it seems clear that the limited liability of Dewey which the court now applies to the eighty shares is repugnant to the previous decisions, and therefore the effect of citing approvingly the cases in question and yet deciding, as the court now does, is but at one and the same time to approve and disapprove the previous decisions.

Let me briefly state why I think this conclusion inevitable. Certain it is that the previous cases expressly and unequivocally decided that a stockholder who in fraud of the liability as stated makes a transfer of his stock remains at the election of the creditors a stockholder to the same extent as if the transfer had not been made or as if it had been a mere sham. Can there be doubt of this in view of the language of the *Case* case announcing the American rule, of the express statement to that effect in the *Bowden* case, and the fact that in that case the liability, under the call of the Comptroller, was enforced for the debts existing months after the completed transfer and not merely for the unsatisfied debts existing at the time of the transfer? Is this not certain also in view of the declaration in *Stuart* v. *Hayden,* that because of the fraudulent transfer the stockholder continued to be liable under the statute? And mark, in the *Hayden* case, as if *ex industria* to exclude the conception that the fraud was only relative as to creditors existing at the time of the fraudulent transfer, the court expressly declared that the liability of the transferring stockholder was to the receiver and according to the terms of the statute. And this, but in different form, reiterated the declaration made in the *Bowden* case, that the fraud was a fraud on the statute, and not, therefore,

simply relative; as to particular creditors existing at the time.

Besides to me it seems that the rule of limited liability now announced is self-destructive. What is the liability which the statute imposes? Is it a responsibility only to pay debts of the bank as they existed at the time a fraudulent transfer was made? Not so; for the only liability imposed by the statute on the stockholders is an obligation to respond to an equal and ratable assessment made by the Comptroller to pay the debts existing at the time of the failure. Rev. Stat. §§ 5151, 5234. From this it results that if a person is not a stockholder at the time of the failure he is liable for nothing, and if he is such stockholder he is liable for the statutory sum and no other. This plain result of the statute to my mind demonstrates the error of the conclusion as to limited liability now announced. For, if Dewey was not a stockholder at the time of the failure there is an entire absence of statutory authority to make any assessment whatever upon him, and if he was such stockholder then the statute fixed the measure of liability, and there is no power to substitute by judicial discretion a liability which the statute does not impose, and which on the contrary is excluded by its express terms. In other words, the statute imposes a uniform and ratable liability upon all stockholders who are liable at all and affords no justification for assessing one stockholder at one amount and another stockholder in another sum, upon the theory that the date of the contracting of debts and not the date of the failure is the test of liability.

And that this departure from the long received and judicially sanctioned construction of the statute will tend to destroy the security of the national banking system by rendering the double liability impossible of enforcement results from a few obvious considerations. Thus, under the rule now announced, one who owns or controls a majority of the stock of a national bank, knowing it to be insolvent, can transfer his stock to wholly irresponsible persons in order to avoid the statutory liability,

and, by postponing the date of open failure until the existing debts of the bank have been extinguished by novation, leave the creditors existing at the time of the failure with substantially no stockholder to respond to the double liability. Indeed, this condition of things cannot be more cogently made manifest than by considering the facts in this case as found by the court. What are they? They are that Dewey was an officer of the bank and knew its hopelessly insolvent condition, and that he transferred his stock to avoid the liability, leaving the shares in the name of his agent or causing that agent to put the same in the names of irresponsible people. In effect controlling the affairs of the bank, Dewey delays the open failure until by a change of the situation, although the indebtedness of the bank may not have diminished, yet, by a mere substitution of creditors, the particular debts due at the time of his fraudulent transfers have largely been extinguished. And thus, when the open failure comes, it is now decided that, as to the shares fraudulently transferred by his agent, Dewey owes nothing towards payment of the debts of the bank, except as to debts still existing, which were contracted prior to the fraudulent transfers. In other words, it is held that although the bank was insolvent prior to and at the time of the commission of the fraudulent acts and continued so to the time of the failure, the fraudulent transferrer has accomplished the wrong which the statute was intended to prevent by holding back and preventing the open failure until he had discharged, at the expense of the subsequent creditors of the bank, the indebtedness existing at the time of the fraudulent transfers. Under the rule hitherto prevailing the duty of the administrative officer was plainly marked out in the statute, to realize the assets, and, if necessary to meet a deficiency of assets, to assess ratably the legal stockholders—a simple and effective rule. Now the duty of the administrative officer is wholly changed. He must analyze the situation at the bank, he must determine who were creditors at this time and that, in order to fix the liability of stockholders, and when this process is gone through

with, instead of levying the equal and ratable statutory liability, he must call upon the shareholders for unequal and unratable contributions.

I can see no reason for now changing the construction of the National Banking Act as applied in forty years of administration, as embodied in the text and spirit of the statute and as sanctioned by a long line of decisions of this court, especially when the inevitable consequence of such change will, in my judgment, operate to the detriment of the public interest and the security and stability of national banks which it was the purpose of Congress by the statute to secure.

It remains only to briefly notice the case of *Peter* v. *Union Mfg. Co.*, 56 Ohio St. 181, heretofore referred to and cited by the court in its opinion. To understand that case a prior decision of the Supreme Court of Ohio, *Brown* v. *Hitchcock*, 36 Ohio St. 667, of which the opinion in the *Peter* case was but an evolution, must be taken into view. In *Brown* v. *Hitchcock*, interpreting the Ohio law, the Supreme Court of Ohio held that by the effect of the constitution and laws of that State a stockholder in an Ohio corporation who was subjected to a double liability was impotent to dispose of his stock, however *bona fide* might be the sale or disposition thereof, so as to escape liability to creditors who were such at the time of the transfer. In other words, the court held that the effect of that double liability imposed by the Ohio statutes was to prevent an efficacious transfer of the stock without the consent of the creditors, since such creditors, despite a *bona fide* sale, as long as debts contracted previously remained unsatisfied, had the power, if circumstances required, to proceed against the stockholders who were such at the time the debt was contracted, and this irrespective of whether the corporation was at the time of the transfer solvent or insolvent. Subsequently, in the *Peter* case, the Ohio court was called upon to determine how far a transfer of stock by a stockholder in an Ohio corporation operated to relieve him from future debts of the corporation. As to this question the court, in effect,

applied to the Ohio statutes the English "out and out" rule; in other words, that court, whilst reiterating its ruling as to existing creditors, decided that a stockholder who made an out and out sale, although the corporation was insolvent and the purpose was to escape the double liability, was discharged from any responsibility to future creditors, although remaining liable to existing creditors. The difference between the Ohio statutes, as thus expounded, and the National Banking Act, as expounded by this court, is at once demonstrated by the statement that under the National Banking Act the stockholder, as repeatedly decided by this court, has a right, when acting in good faith, to dispose of his stock and escape liability both as to existing and future creditors, and that the theory of out and out transfers as to future debts, applied by the Ohio court to the statute of that State, was expressly repudiated by this court as to the National Banking Act in the *Case* and subsequent decisions. To treat then the Ohio case as authoritative here is, in effect, but to expunge the National Banking Act from the statutes of the United States and to substitute in its stead the statutes of Ohio, when such statutes have a wholly different significance as interpreted by the highest court of that State.

I therefore dissent.

I am authorized to say that Mr. Justice McKenna and Mr. Justice Day concur in this dissent.