## MATTESON *v.* DENT.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 124. Submitted January 29, 1900. — Decided February 26, 1900.

As a general rule, the legal owner of stock in a national banking association — that is, the one in whose name stock stands on the books of the association — remains liable for an assessment so long as the stock is allowed to stand in his name on the books, and, consequently, although the registered owner may have made a transfer to another person, unless it has been accompanied by a transfer on the books of registry of the association, such registered owner remains liable for contributions in case of the insolvency of the bank.

The exceptions to this general rule so far as established by decisions of this court are: (1) That where a transfer has been fraudulently or collusively made to avoid an obligation to pay assessments, such transfer will be disregarded, and the real owner be held liable; (2) That where a transfer of stock is made and delivered to officers of a bank, and such officials fail to make entry of it, those acts will operate a transfer on the books, and extinguish the liability, as stockholder, of the transferrer; (3) Where stock was transferred in pledge, and the pledgee for the purpose of protecting his contract caused the stock to be put in his name as pledgee, and a registry did not amount to a transfer to the pledgee as owner.

On October 31, 1864, Sumner W. Matteson became the owner of ten shares of capital stock of the First National Bank of Decorah, established in the city of Decorah, State of Iowa, and the shares were duly registered on the books of the bank in his name. In July, 1895, Matteson, whilst the stock was yet owned by him and still stood registered in his name, died intestate at St. Paul, Minnesota, where he resided,

leaving surviving his widow and six children, two of whom
were minors. The probate court of Minnesota having juris-
diction over his estate appointed an administrator, who filed
an inventory in which was embraced the shares of stock in
question. In September, 1896, a final account having been
previously filed by the administrator, a decree turning over
the estate, including the ten shares of stock, was entered.
Under this decree the widow and heirs took the ten shares
of stock in indivision in proportion to their interest in the
estate; that is to say, the widow became the owner of an
undivided third interest in the stock and each of the children,
there being six, of a one ninth interest therein, thus the widow
owned three ninths of the ten shares and each of the six chil-
dren one ninth. No notice of the death of Matteson or of
the allotment in question was conveyed to the bank, nor was
any transfer of the stock on the books of the bank operated
at the time of the allotment or subsequent thereto. Indeed,
under the proportions of undivided ownership of the stock
in the widow and heirs, it was impossible to have registered
on the books of the bank in the name of each owner sepa-
rately according to their respective ownership in the ten shares
without some further partition of the undivided ownership
existing between them. It follows that the stock which
stood on the books of the bank in the name of Matteson
during his life continued to so stand after his death, so
remained at the time of the allotment, and was so registered
at the time this suit was brought. On November the 10th,
1896, the bank became insolvent and was closed by the Comp-
troller of the Currency, who on the 24th of November, 1896,
appointed a receiver. In January, 1897, in order to pay the
debts of the bank, under the authority conferred on him by
law (Rev. Stat. § 5151), the Comptroller made an assessment
upon the shareholders of one hundred dollars upon each share,
and proceedings for its enforcement were by him directed to
be taken. The assessment not having been paid, although
due notice was given to do so, the receiver sued in the state
court of Ramsey County, Minnesota, the widow and children
of Matteson, as next of kin, asking judgment for the amount

of said assessment. The suit was in conformity to the General Statutes of 1894 of Minnesota, which, in sections 5918 *et seq.*, permitted an action to be brought against all or one or more of the next of kin of a deceased person, by the creditor of an estate, to recover the distributive shares received out of such estate, or so much thereof as might be necessary to satisfy a debt of the intestate or of his estate. Service was had only upon the widow and one of the children. A general demurrer to the complaint was filed and overruled, and the order so overruling the demurrer was, upon appeal, affirmed by the Supreme Court of the State. 70 Minn. 519. Thereafter the demurring defendants answered setting forth in substance their non-liability to pay said assessment under the statute of the United States governing the winding up of insolvent national banking associations. A motion for judgment upon the pleadings was thereupon made and granted, and judgment was entered in favor of the receiver against Louise M. Matteson, and Charles D. Matteson, and each of them, in the sum of one thousand dollars with interest and costs. On appeal to the Supreme Court of the State of Minnesota, that court affirmed the judgment. 75 N. W. Rep. 1041. A writ of error was allowed, and the judgment of affirmance is now here for review.

*Mr. Edmund S. Durment* and *Mr. Albert R. Moore* for plaintiffs in error.

*Mr. Frank B. Kellogg, Mr. Daniel W. Lawler, Mr. George R. O'Reilly* and *Mr. Fitzhugh Burns* for defendant in error.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

The questions arising on this record involve a consideration of sections 5918 *et seq.* of the General Statutes of the State of Minnesota and of the sections of the Revised Statutes of the United States which are in the margin.[1]

---

[1] SEC. 5139. The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and

Leaving out of view for the moment the legal effect of the allotment of the ten shares of stock to the next of kin of Matteson, let us consider what, if any, liability rested upon his estate to pay the assessment on the ten shares of stock which stood at his death in his name, and so remained up to the time of the allotment. Because the insolvency of the bank took place after the death of Matteson, did it result that the assessment, which was predicated upon the insolvency, was not a debt of his estate? To so decide the statute must be construed as imposing the liability on the shareholder for the amount of his subscription when necessary to pay debts, only in case insolvency arises during the lifetime of the shareholder. In other words, that all liability of shareholders, to contribute

---

transferable on the books of the association in such manner as may be prescribed in the, by-laws or articles of association. Every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares; and no change shall be made in the articles of association by which the rights, remedies or security of the existing creditors of the association shall be impaired.

&ast; &ast; &ast; &ast; &ast; &ast;

SEC. 5151. The shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares; except that shareholders of any banking association now existing under state laws, having not less than five millions of dollars of capital actually paid in, and a surplus of twenty per centum on hand, both to be determined by the Comptroller of the Currency, shall be liable only to the amount invested in their shares; and such surplus of twenty per centum shall be kept undiminished, and be in addition to the surplus provided for in this title; and if at any time there is a deficiency in such surplus of twenty per centum, such association shall not pay any dividends to its shareholders until the deficiency is made good; and in case of such deficiency the Comptroller of the Currency may compel the association to close its business and wind up its affairs under the provisions of chapter four of this title.

SEC. 5152. Persons holding stock as executors, administrators, guardians or trustees shall not be personally subject to any liabilities as stockholders; but the estates and funds in their hands shall be liable in like manner and to the same extent as the testator, intestate, ward or person interested in such trust funds would be if living and competent to act and hold the stock in his own name.

to pay debts, ceases by death. This construction, however, would be manifestly unsound. The obligation of a subscriber to stock, to contribute to the amount of his subscription for the purpose of the payment of debts, is contractual, and arises from the subscription to the stock. True, whether there is to be a call for the performance of this obligation depends on whether it becomes necessary to do so in consequence of the happening of insolvency. But the obligation to respond is engendered by and relates to the contract from which it arises. This contract obligation, existing during life, is not extinguished by death, but like other contract obligations survives and is enforceable against the estate of the stockholder. The principle controlling the subject was quite clearly stated by Shipman, J., in *Davis* v. *Weed*, 7 Fed. Cas. 186. There, stock of a national bank stood in the name of a person who died in January, 1871. Nearly one year afterwards, on December 12, 1871, the bank became insolvent, and more than five years thereafter several assessments were made by order of the Comptroller of the Currency, and an action was instituted against the administrator to enforce payment. Two defences were interposed by the administrator, as follows: 1, that the estate of the decedent had been settled according to law, prior to the assessments, and that as there were no assets in the hands of the administrator at the time of the demand and he had fully administered the estate and had received no assets since the demand, no judgment could be rendered against him; and, 2, that inasmuch as the insolvency of the bank occurred after the death of the intestate, when the title of the stock became vested in the administrator, no debt or liability existed at any time against the estate; that the liability, if any, was against the administrator, who, by section 5152 of the Revised Statutes, was freed from personal liability, and was only liable to the extent of the trust estate and funds in his hands at the time of the demand.

The first contention was held untenable, upon a consideration of the statutes of Connecticut in regard to the settlement of estates, and the presentation, allowance and payment of claims against the estates of solvent deceased persons. In disposing of the second contention the court said:

"The original liability of the intestate to pay the assessments which may be ordered by the Comptroller was a voluntary agreement, evidenced by his subscription or by his becoming a stockholder. It is not imposed by way of forfeiture or penalty. It is imposed by the statute, but it also exists by virtue of the contract which the intestate entered into when he became a stockholder. When the stockholder dies his estate becomes burdened with the same contract or agreement which the dead man had assumed, and so long as it, through the executor or administrator, holds the stock as the property of the estate, and the stock has not been transferred on the books of the bank, and the liability has not been discharged by some act which shows that the new stockholder has taken the place of the old one, the contract liability still adheres to the estate. This liability is not the result of any new contract, for the administrator did not voluntarily become the owner of the stock; it came to him as the dispenser of the goods of the dead, and the liability rested upon the stock, and was a part of the contingent liability of the estate, at least until it was transferred to some other person by a transfer free from fraud."

The question was settled in *Richmond* v. *Irons*, 121 U. S. 27, where the court said (pp. 55, 56):

"Under the national banking act the individual liability of the stockholders is an essential element of the contract by which the stockholders became members of the corporation. It is voluntarily entered into by subscribing for and accepting shares of stock. Its obligation becomes a part of every contract, debt and engagement of the bank itself, as much so as if they were made directly by the stockholder instead of by the corporation. There is nothing in the statute to indicate that the obligation arising upon these undertakings and promises should not have the same force and effect, and be as binding in all respects, as any other contracts of the individual stockholder. We hold, therefore, that the obligation of the stockholder survives as against his personal representatives. *Flash* v. *Conn*, 109 U. S. 371; *Hobart* v. *Johnson*, 19 Blatchford, 359. In Massachusetts it was held, in *Grew* v. *Breed*, 10 Met.

569, that administrators of deceased stockholders were chargeable in equity, as for other debts of their intestate, in their representative capacity."

And a similar determination as to the nature of a responsibility like the one in question has been arrived at by the state courts in decisions on kindred statutes, and, indeed, its correctness is not controverted by any authority to which we have been referred or which we have been able to examine. The accepted doctrine finds nowhere a more lucid statement than in the courts of New York. Thus, in *Bailey* v. *Hollister*, 26 N. Y. 112, judgment having been recovered against a manufacturing company upon indebtedness which arose in the years 1849, 1850, 1851, 1852 and 1853, an action was brought, after return of execution unsatisfied, to recover the same debt from the personal representatives of the estate of one Kirkpatrick, on the ground that when such indebtedness was contracted the estate of Kirkpatrick was a stockholder, and, as such, personally liable under the charter of the company. Kirkpatrick had died intestate in 1832, and the stock stood on the books of the company in his name until 1844, when it was entered in a new stock ledger in the name of the estate, which thereafter received dividends. The facts of this transfer and the payment of dividends were not, however, in the opinion of the court treated as material factors in the decision. The court, in an opinion delivered by Gould, J., said (p. 116):

"It will be conceded that when a stockholder in any corporation dies, his estate succeeds him in the title to, and the rights in, the stock he held. Of necessity, it must take that title and those rights subject to any liability then existing upon them; and so long as the estate is, by operation of law, the holder of such stock, the estate must become responsible for any obligations accruing during that time which the law may impose upon any holder of the stock as such. Such liability proceeds not from any new contract, made by or on behalf of the estate, but is inherent in the property itself. To avoid it the estate must part from the property; must cease to be the holder of the stock. Or, calling it a contract liability, it arises out of a contract made by the stockholder,

and binding his personal representatives, as it bound him, as long as the relation of stockholder existed."

And it may be added, the law presumes, in the absence of express words, that the parties to a contract intend to bind not only themselves, but their personal representatives. *Kernochan* v. *Murray*, 111 N. Y. 306.

The doctrine enunciated in *Bailey* v. *Hollister*, as above stated, was later applied in *Cochran* v. *Wiechers*, 119 N. Y. 399, 403, where the court held that liability imposed by statute upon stockholders in limited liability companies to respond for the debts of the company, "to an amount equal to the amount of stock held by them respectively," was in the nature of a contract obligation, which survived the death of the stockholder. The court, after approvingly quoting a portion of the opinion of Gould, J., above excerpted, added (p. 404):

"The liability of the estate of the deceased stockholder under the statute is so well established, upon principle and authority, that further discussion is unnecessary. *Chase* v. *Lord*, 77 N. Y. 1; *Flash* v. *Conn*, 109 U. S. 371; *Richmond* v. *Irons*, 121 U. S. 27."

The debt then being one due by the estate of Matteson, if the allotment of the shares in indivision be not considered, the question then is, taking the allotment into view, what was its effect? The argument is that the next of kin to whom the allotment was made can only be held responsible to the extent of the interest which they took in the stock, and therefore there was error committed in enforcing the whole amount of assessment against the next of kin who were served, to the extent of the distributive share of the property of the estate received by them. But this contention directly conflicts with the interpretation of the statutes of Minnesota by the court of last resort of that State in this case. It is clear that, by necessary implication, it was decided that by the statutes of Minnesota under which the allotment in indivision was made, the heirs or next of kin remained, by operation of law, to the extent to which they received the property of the estate, subject to be sued and to respond to the debts of the estate existing at the time the allotment took place. But the rights arising

from the allotment, under the statutes of Minnesota, cannot be greater than those which the statutes in question conferred. The contention, therefore, amounts to this, that in so far as the statutes of Minnesota operated in favor of the participants in the allotment the statutes are to be respected, but to the extent that they imposed obligations upon the allottees they are not bound thereby. It is argued, however, that as by the law of Minnesota the liability to be called upon to pay a debt of the estate, to the extent of the distributive share received, depended solely upon whether there was such debt existing at the time the allotment was made, and as there was no such debt in the present instance, no duty to respond arose. This is predicated upon the assumption that because the insolvency happened after the allotment, therefore there was no debt at the time of the allotment. This assumes that whether there was a debt depended upon the date of the insolvency. In effect, this is but to argue that the estate was never liable at all. Such clearly is the essence of the proposition, for if it be that whether there was a debt is to be alone ascertained by the happening of insolvency and not by referring to the date of the subscription, then where insolvency occurred after the death of the stockholder, there would be no responsibility. The unsoundness of this view has been already demonstrated. Moreover, the Supreme Court of Minnesota, in effect, in this case has held that the statute of that State making the allottees liable, each to the amount of their distributive share, for the debt of the estate embraced a contract liability, to pay an assessment, contingent on the happening of insolvency, although that event had not taken place at the time of the allotment.

The contention is next made that conceding there was a debt of the estate, and granting that the statute embraced a preëxisting contract obligation which had not ripened into an actual demand because insolvency had not taken place, nevertheless the court below erred, because by the effect of the allotment the estate had ceased to exist and all its property had passed to the allottees   This but reiterates the misconception already disposed of.   Whether the effect of the allotment

was to extinguish the estate, was wholly dependent on the Minnesota law. That law, as construed by the courts of Minnesota in this case, in substance provides (for the purpose of the enforcement of the debts of the estate then actually exist-. ing or resting in contract, and liable to arise from events to take place in the future) that the estate should, in legal effect, continue to exist, to the extent provided, for the purpose of enforcing the debts in question.

These considerations would dispose of the case, since they demonstrate that no substantial Federal question was involved but for the fact that it is claimed that, as under the statute of the United States each stockholder in a national bank can only be liable to the extent of the amount of his stock therein, at the par value thereof, in addition to the amount invested in such shares, therefore the enforcement of the liability for the whole amount against one of the allottees deprives him of the benefit of the Federal statute and involves a misconstruction of its provisions. This contention was considered and adversely decided below. It is conceded that no notice of the allotment was ever given to the bank, and that the stock in question was never registered in the name of the allottees. But the settled doctrine is that, as a general rule, the legal owner of stock of a national banking association — that is, the one in whose name stock stands on the books of the association — remains liable for an assessment so long as the stock is allowed to stand in his name on the books, and, consequently, that although the registered owner may have made a transfer to another person, unless it has been accompanied by a transfer on the books of registry of the association, such registered owner remains liable. *Upton* v. *Tribilcock*, 92 U. S. 45; *Sanger* v. *Upton*, 91 U. S. 56; *Webster* v. *Upton*, 91 U. S. 65; *Pullman* v. *Upton*, 96 U. S. 328; *Anderson* v. *Philadelphia Warehouse Co.*, 111 U. S. 479; and *Richmond* v. *Irons*, 121 U. S. 27, 58. This principle thus settled as to the stockholders in national banks is in entire accord with the rule established by state courts in construing statutes containing substantially similar provisions. In *Shellington* v. *Howland*, 53 N. Y. 371, 376, it was said:

" There may have been a transfer by the defendant of his stock to the corporation in 1869, valid as between the parties to the transaction, and sufficient to vest the equitable title in the transferee, but the transfer was not consummated in the form required by statute, so as to affect the rights of strangers or to relieve the defendant from his legal liability to third persons for the debts of the corporation. . . . The transfer of stock, *quoad* the public, is not complete until entered on the book designated by statute. An entry upon the books of registry of stockholders is required for the protection of the company and its creditors, and each may hold the stockholders to their liability as such until they have divested themselves of the title to their shares by a completed transfer, as prescribed by law. No secret transfer will avail to release the stockholder from his obligations, or deprive the creditors of the corporation of the right to look to him as the responsible party liable for the debts of the corporation."

Indeed, this doctrine is so universally settled that it is treated as elementary. See Thompson on Corporations, sections 3283 and 3284.

True it is that exceptions have been engrafted upon this doctrine as to national bank stockholders by decisions of this court, but none of them are germane to the matter now considered. Cases enunciating certain of the exceptions referred to are cited in the following summary:

1. Where a transfer has been fraudulently or collusively made to avoid an obligation to pay assessments, such transfer will be disregarded and the real owner be held liable. *Germania National Bank* v. *Case*, 99 U. S. 628, 631, 632; *Bowden* v. *Johnson*, 107 U. S. 251, 261.

2. Where a transfer of stock is made and delivered to officers of a bank, and such officials fail to make entry of it, the acts referred to will operate a transfer on the books, and extinguish the liability as stockholder of the transferrer. *Whitney* v. *Butler*, 118 U. S. 655. In the case just cited, in applying the exception, the court very carefully and accurately restated the general rule.

3. Where stock was transferred in pledge, and the pledgee

for the purpose of protecting his contract caused the stock to be put in his name on the books as pledgee, it has been held that such a registry did not amount to a transfer to the pledgee as owner, and that he therefore was not liable although the pledgor might continue to be so. *Pauly* v. *State Loan & Trust Co.*, 165 U. S. 606.

These and other cases unnecessary to be referred to do not impair, but, on the contrary, serve to prove the general rule. As in the case now before us the stock remained on the books in the name of Matteson, continued as a liability of the estate and was never transferred under the allotment, it follows that the allottees have no right to complain because the receiver has availed himself of the provisions of the Minnesota statute.

*Judgment affirmed.*