LOCHNER, Plaintiff in error, vs. THE STATE, Defendant in error.

*November 10, 1933—February 6, 1934.*

For the plaintiff in error there was a brief by *Fish, Marshutz & Hoffman,* attorneys, and *I. A. Fish, F. C. John,* and *W. H. Voss* of counsel, all of Milwaukee, and oral argument by *Mr. Fish.*

For the defendant in error the cause was submitted on the brief of the *Attorney General, William A. Zabel,* district attorney of Milwaukee county, and *Winfred C. Zabel,* first deputy district attorney.

NELSON, J. The indictment herein contains nine counts, each of which charges a violation of sec. 221.17, Stats. So much of that section as is here material provides:

"Any banker, officer, director or employee of any bank who shall wilfully and knowingly subscribe to or make, or cause to be made, any false statement or false entry in the books of any bank, or mutual savings bank, or shall knowingly subscribe to or exhibit false papers, with the intent to deceive any person or persons authorized to examine into the affairs of said bank, or mutual savings bank, or shall knowingly make, state, or publish any false report or statement of any such bank, or mutual savings bank, shall be deemed guilty of a felony, and upon conviction thereof shall be punished . . ."

The first count of the indictment charges that on February 11, 1930, the defendant was president and director of the Bank of Shorewood and that he wilfully and knowingly subscribed to and made, or caused to be made, false statements or false entries in the books of said bank, and knowingly subscribed to and exhibited false papers with the intent to deceive any person or persons authorized to examine into the affairs of the bank, in that he entered and caused to be entered in the books and records of the bank the name of one T. J. Marlier as having subscribed to and paid for ten shares of the capital stock of the bank, and issued and caused to be issued to the said T. J. Marlier certificate No. 215 for said stock, subscribed by the said Fred A. Lochner as president of said bank, for the said ten shares, and entered and caused

to be entered in the books of said bank the name of said T. J. Marlier as the owner and holder of said stock, when in fact the said Fred A. Lochner was the subscriber to the said stock and paid therefor and was the holder and owner thereof, contrary to the statute in such case made and provided and against the peace and dignity of the state of Wisconsin.

The second, third, fourth, fifth, and sixth counts are substantially the same as the first count except as to the dates of the alleged offenses, the number of shares involved, and the names of Jacob Strass, James H. Pratt, W. H. Bennett, and John Reisner, in whose names respectively the stock was entered in the books of the bank.

The seventh count charges that "on March 12, 1930, in the county of Milwaukee and state of Wisconsin, Fred A. Lochner, as president and director of the Bank of Shorewood, wilfully and knowingly subscribed to and made and caused to be made false statements and false entries in the books of the said bank, and knowingly subscribed to and exhibited false papers, with the intent to deceive any person and persons authorized to examine into the affairs of said bank, and knowingly made, stated and published a false report and statement of the said bank, in that he, the said Fred A. Lochner, then and there, in the manner and with intent as aforesaid, made and caused to be made, and subscribed and swore thereto, a statement of the stockholders of the said bank, with the number of shares owned and held by each, as required by section 221.15 (6) of the Wisconsin Statutes, and included therein the names of certain person and persons who were not in fact holders of stock in the said bank, the shares purported in said statement to be held by them being in fact owned and held by the said Fred A. Lochner, and in said statements excluded the falsely reported shares from the statement of the shares owned by the said Fred A. Lochner, and that the said Fred A. Lochner

mailed or caused to be mailed the said list, report and statement to the Commissioner of Banking, all contrary to the statutes."

The eighth count charges an offense as of April 3, 1930, similar to that alleged in the seventh count, and alleges that the report or statement to the Commissioner of Banking under date of April 3, 1930, included W. H. Bennett as the owner and holder of fifteen shares, T. J. Marlier as the owner and holder of twenty shares, J. H. Pratt as the owner and holder of thirty-five shares, and Jacob Strass as the owner and holder of forty-five shares, all of which it is alleged were owned and held by the defendant.

The ninth count is substantially the same as the eighth count except the date alleged therein, January 16, 1931, and except that it also alleges the name of John Reisner as the owner and holder of twenty-five shares.

While the allegations of the several counts of the indictment are general, broadly following the language of the statute and not as specific as might be desirable, it is very evident from the proof adduced upon the trial that by the allegations of the first count it was intended to charge an offense based upon an entry in the stock register of the bank which showed that Marlier was the owner of certain stock; that the second, third, fourth, fifth, and sixth counts were based upon similar entries, which showed that Pratt, Strass, Bennett, and Reisner were the owners of stock. It is also clear that the seventh, eighth, and ninth counts intended to charge that the defendant knowingly subscribed to or exhibited false reports to the Commissioner of Banking with intent to deceive such officer.

The proof adduced by the state upon the trial in support of the first and fourth counts is substantially as follows: On December 20, 1923, Marlier was the owner of two shares of Bank of Shorewood stock of the par value of $100 each. The total capital stock of the bank was $25,000. In 1930

the amount of authorized stock was increased to $50,000 and the par value of each share of stock was reduced to $20. On February 11, 1930, he sold two shares of stock to the defendant for $500 and assigned and delivered his certificate therefor to him. The two shares were not transferred on the stock register. Thereafter, when the twenty-dollar par stock was ready to be exchanged for the old stock, Marlier receipted to the bank for certificate No. 215 for ten shares in place of the two shares which he had theretofore owned and theretofore sold to the defendant. He indorsed the new stock and turned it over to the defendant. He also subscribed for ten shares of additional stock to which he was entitled only on the theory that he was still a stockholder. He receipted to the bank for certificates Nos. 267 and 268, which he indorsed in blank and delivered to the defendant. Thereafter he indorsed four separate dividend checks issued in his name and turned them over to the defendant. He also signed a power of attorney authorizing the cashier to indorse over to Safety Deposit Company a special dividend declared by the bank. Marlier testified that he knew when he signed the receipt on the stock book that he became a stockholder of record, knew that he would remain a stockholder of record until the shares were presented for transfer, and knew that by receiving dividend checks he was a stockholder of record up to June 30, 1931. He asked the defendant several times about having the stock taken out of his name but never presented the stock to the bank for transfer after he had indorsed it, nor took any other steps looking to the transfer of such stock on the books of the bank.

The proof adduced by the state in support of the second count is substantially as follows: In December, 1928, at the request of the defendant, Strass bought five shares of bank stock from Arthur J. Straus. He paid for the stock with his own money but was later reimbursed therefor by the defendant. The Straus certificate was exchanged for an-

other certificate which was indorsed in blank by Strass and delivered to the defendant. That certificate was, upon the increase of the capital structure, on February 11, 1930, exchanged for a certificate for twenty-five shares, which was in turn exchanged for three certificates aggregating twenty-five shares. The three certificates just mentioned were, on and between March 15 and March 19, 1930, assigned and transferred to others not connected with this controversy. Strass receipted for all of the certificates mentioned which were issued in his name. Later on he subscribed and receipted for twenty-five shares of the additional stock to which he, if a stockholder, was entitled. At another time shortly prior to July 12, 1929, at the request of the defendant, he purchased four shares of stock from one Baer. A new certificate in exchange therefor was issued to Strass on July 12, 1929, which certificate was receipted for by him and delivered to the defendant. Later on this certificate was exchanged for twenty shares of the twenty-dollar par value stock which Strass receipted for, but which he indorsed in blank and delivered to the defendant. This stock was later sold to one Burke. Strass testified that when he bought the Straus stock the defendant asked him to permit the stock to be carried in his name and that he consented without hesitation. Strass testified that he knew there was stock in his name because every time dividends were declared a dividend check was presented to him which he indorsed and handed to the defendant. He attended one stockholders' meeting and also signed a power of attorney authorizing the cashier to indorse the special dividend check over to the Safety Deposit Company.

The proof adduced by the state in support of the third count is substantially as follows: On December 20, 1923, one Grossman was the owner of ten shares of stock represented by one certificate which was thereafter exchanged for two certificates for seven and three shares respectively.

Certificate No. 91 for seven shares was indorsed by Grossman and reissued to Pratt, who receipted for it. He indorsed the stock and turned it over to defendant. Later on the certificate for seven shares was exchanged for a certificate for thirty-five shares which was receipted for by Pratt on February 11, 1930, which in turn was exchanged for three certificates which were receipted for by three persons not connected with this controversy. Pratt subscribed and receipted for thirty-five shares of the new stock to which he was entitled, if a stockholder, under the increase in the capital structure. Pratt testified that the defendant told him he was buying the Grossman stock and wanted to put seven shares in his name; that defendant did not want to show so much stock in his name; that defendant brought in a certificate for seven shares which he indorsed and turned over to defendant; that defendant kept it; that he paid no money to the Bank of Shorewood or to Lochner for such stock; that he told defendant he did not like to have stock in his name but that it would be all right for a short while; that dividend checks were presented to him from time to time and that each time a dividend check was presented to him he requested the defendant to take the stock out of his name; that at a meeting held at a downtown office long after any of the statements or reports were sent to the Commissioner of Banking, he requested Gabel, who was the vice-president of the bank, and the defendant to see that the stock was taken out of his name; that the stock certificates issued in his name were never presented to the bank for transfer.

The proof adduced by the state in support of the fifth count consisted of the facts revealed by the stock register, which are substantially as follows: On December 20, 1923, one Goodman was the owner of ten shares of stock. The original certificate was replaced by three certificates, one of which, certificate No. 109, was for five shares issued to

Goodman. Certificate No. 109 was replaced by certificate No. 123 issued to Bennett on September 24, 1929, and receipted for by him. Certificate No. 123 was exchanged for certificate No. 202 for twenty-five shares issued in the name of Bennett and receipted for by him. This certificate was evidently indorsed in blank with defendant's name written thereon in pencil and exchanged for three certificates which were issued to others not connected with this controversy. Bennett subscribed for twenty-five shares of stock to which he was entitled, if a stockholder, receipted for the same and indorsed and delivered the said certificates to the defendant. Bennett was not produced as a witness.

The proof adduced by the state in support of the sixth count is substantially as follows: On February 11, 1930, one Goetz was the owner of certificate No. 204 for fifteen shares and later on the owner of certificate No. 317 for fifteen shares which were assigned to Louis P. Lochner. These two certificates were later exchanged for other certificates, among which were three certificates aggregating twenty-five shares issued to Reisner. All three certificates were receipted for by Reisner on September 18, 1931. He indorsed them in blank and delivered them to the defendant. Mr. Reisner testified that he was a brother-in-law of the defendant; that the defendant issued twenty-five shares of stock in his name for which he never paid anything; that defendant brought the stock to him and he signed and receipted for the same and indorsed the stock; that he did not keep the stock in his possession; that defendant wanted him to have the shares of stock in his name; that he knew when he signed for the stock that he became a stockholder of record and intended to become a stockholder of record and knew that it subjected him to liability unless the stock was transferred again; that he did nothing to have the stock transferred by the bank.

In support of the seventh and eighth counts of the information the state proved that on April 3, 1930, there were forwarded to the state banking department at Madison, two lists of the stockholders. One was dated April 1, 1930, and listed the holders of 2,500 shares which represented the $50,000 capital structure. In that list it was stated that Bennett was the holder of 25 shares; defendant, 1,145 shares; Marlier, 20 shares; Pratt, 35 shares; Strass, 45 shares; defendant, 6 shares. That list was certified by Bartlett, cashier. The other, which was sworn to by defendant as of March 12, 1930, listed the holders of 250 shares which represented the old $25,000 capital structure. In that list the following are named as holders of stock: Marlier, 2 shares; defendant, 127 shares; Pratt, 7 shares; Bennett, 5 shares.

In support of the ninth count the state proved that under date of January 16, 1931, there was sent to the state banking department at Madison a certified list of stockholders of the bank and the number of shares held by each, as of January 1, 1931. The following holders of stock were listed therein: Bennett, 25 shares; defendant, 1,151 shares; Pratt, 35 shares; Strass, 45 shares; Reisner, 25 shares. This report or statement purports to have been made only by George D. Bartlett, cashier, who verified the same.

Marlier, Pratt, and Strass were close friends of the defendant and were associated with him in several business enterprises in no wise connected with the bank. The defendant officed with them prior to his taking active charge of the bank in March, 1931. The bank was closed by the Commissioner of Banking in 1932 and its affairs taken over by the banking department, under whose direction double liability assessments were made against the stockholders of record, including Pratt, Marlier, Reisner, Strass, and Bennett, for the benefit of the creditors of the bank. Most of the

stock which stood in the names of Marlier and the others was pledged by the defendant to secure a loan made to him by the National Bank of Commerce of Milwaukee.

The defendant contends (1) that the proof adduced by the state fails to show the commission of any offense for the reason that the record indisputably shows that Marlier, Pratt, Strass, Bennett, and Reisner, at all of the times mentioned in the indictment, so far as the bank, the Commissioner of Banking, or the creditors of the bank are concerned and for all the purposes of the law, were stockholders of the bank and therefore there were no false entries made or caused to be made on the books of the bank, or no false statements or reports made to the Commissioner of Banking; (2) that no offense known to our law was committed by the defendant in causing the stock to be issued in the names of others with their consent, and so entered on the books of the bank, or in failing or neglecting to transfer the stock assigned to him on the books of the bank.

We are not here concerned with the right of Marlier and the other stockholders of record mentioned, to assert claims for damages against the defendant for any wrongs done them by him in not having the stock assigned by them to him transferred on the books of the bank.

The questions before us are: (1) whether the defendant made or caused to be made false entries on the books of the bank by being a party to having certain stock purchased by him, or at his request, entered on the books of the bank in the names of certain of his friends and associates with their consent; (2) whether sending or causing to be sent to the Banking Commissioner statements containing the names of persons who were stockholders of record but who, to the knowledge of the defendant, had theretofore assigned their stock to him, constitutes the making of a false report or statement.

It is generally held that the person in whose name stock stands on the stock register of the bank is a stockholder of the bank and continues as such record stockholder, so far as the bank, the Commissioner of Banking, and the creditors of the bank are concerned and for all the purposes of the law, until such stock is presented to the bank for transfer on its books, even though he may have assigned his stock to another. *Parker v. Brunder,* 187 Wis. 75, 203 N. W. 941; *Anderson v. Philadelphia Warehouse Co.* 111 U. S. 479, 4 Sup. Ct. 525; *Richmond v. Irons,* 121 U. S. 27, 7 Sup. Ct. 788; Morse on Banks and Banking (6th ed.), sec. 679.

Sec. 221.43 provides:

"The shares of stock of an incorporated bank shall be deemed personal property, and shall be transferred on the books of the bank in such manner as the by-laws thereof may direct. . . ."

The general rule as it affects the assessment of stockholders of record for the benefit of creditors was thus stated in *Matteson v. Dent,* 176 U. S. 521, 20 Sup. Ct. 419, 423:

"As a general rule, the legal owner of stock of a national banking association—that is, the one in whose name stock stands on the books of the association—remains liable for an assessment so long as the stock is allowed to stand in his name on the books, and, consequently, that although the registered owner may have made a transfer to another person, unless it has been accompanied by a transfer on the books of registry of the association, such registered owner remains liable" for contribution in case of the insolvency of the bank.

The rule stated in the *Matteson Case* is subject to an exception which permits an assessment to be made against one who has fraudulently transferred his stock to another who is financially irresponsible, for the purpose of evading his liability as a stockholder (*Germania Nat. Bank v. Case,*

99 U. S. 628, 25 Lawy. Ed. 448; *Bowden v. Johnson,* 107 U. S. 251, 2 Sup. Ct. 246; *Rankin v. Fidelity Trust Co.* 189 U. S. 242, 23 Sup. Ct. 553), or against one who has transferred the stock to his agent, who merely holds such stock as the agent of his principal (*Ohio Valley Nat. Bank v. Hulitt,* 204 U. S. 162, 27 Sup. Ct. 179).

The general rule is subject to the exception that bank stock not actually transferred on the books of the bank will be considered as transferred when the holder of record has done everything that he reasonably can do to effect a transfer on the stock register. *Whitney v. Butler,* 118 U. S. 655, 7 Sup. Ct. 61; *McDonald v. Dewey,* 202 U. S. 510, 26 Sup. Ct. 731; *Parker v. Brumder, supra; Earle v. Carson,* 188 U. S. 42, 23 Sup. Ct. 254; *Apsey v. Kimball,* 221 U. S. 514, 31 Sup. Ct. 695; *State ex rel. Freeling v. Ware,* 82 Okla. 130, 198 Pac. 859, 45 A. L. R. 127.

In *Parker v. Brumder, supra,* the rule is stated thus:

"In 1 Michie, Banks & Banking, p. 203, it is said: 'The transfer of bank stock not regularly entered on the stock books is ineffectual to cut off the individual liability of the stockholder, unless the transferrer has done all that can be required of him to obtain a transfer on the books, the failure to make it being due to neglect of the officials of the bank. It is not enough to rely on the vendee to have the transfer made.' "

It is generally held that delivering a duly assigned certificate of stock to a bank for transfer, when accompanied by a power of attorney to transfer the stock, satisfies the rule that in order to effect a transfer of bank stock the holder must do everything that he can reasonably be expected to do to make a valid transfer of the certificate on the stock register. *Whitney v. Butler, supra; McDonald v. Dewey, supra.* In *Parker v. Brumder, supra,* it was held that a stockholder who assigned his shares of bank stock

by an indorsement in blank and made no effort to have the transfer recorded on the books of the bank was estopped to deny that he was a stockholder when the double liability provided by sec. 221.42, Stats., was sought to be enforced for the benefit of creditors.

It must be held upon the record in this case, which shows that Marlier and the others consented that stock might be placed in their names, accepted the stock issued to them, receipted for the same on the books of the bank, and, after indorsing the stock over to the defendant and delivering the certificate to him, subscribed for new stock upon the increase of the capital stock of the bank, to which they would only be entitled on the theory that they were stockholders, receipted for such stock, permitted the bank to issue dividend checks in their names which they indorsed over to the defendant, executed powers of attorney to the cashier authorizing him to dispose of a special dividend, and did nothing which the law requires them to do to effect a transfer on the books of the bank, that they and each of them became stockholders of the bank and knowingly continued as such, unless the fact that the stock was assigned or indorsed over to the defendant, who was the president of the bank, operated in law as a transfer of the stock to him.

In *Cousins v. Flertzheim,* 182 Wis. 275, 285, 196 N. W. 250, a case ruled by *Whitney v. Butler, supra; Matteson v. Dent, supra; Earle v. Carson,* 188 U. S. 42, 23 Sup. Ct. 254; *Apsey v. Kimball,* 221 U. S. 514, 31 Sup. Ct. 695, it was said:

"The basis for the conclusion announced in the initial case of *Whitney v. Butler, supra,* is that when the stockholder sells his stock to the president or other officer of the corporation properly indorsed in blank with power of attorney to fill in the purchaser, the officer of the corporation receives it with knowledge that the stockholder has parted with his title and that, under such circumstances, he has done

all that he can do to accomplish a transfer on the books of the company; that thereupon it becomes his statutory right to have his stock so transferred, and it becomes the statutory duty of the officer of the company to accomplish such transfer upon the books of the company, and in the absence of any notice that the officers of the company have failed in the performance of such duty or a knowledge of facts which may be reasonably said to raise a question as to their performance of such duty or of their intention to perform such duty, he may rely upon the presumption that the stock will be so transferred upon the books of the corporation. We think this is a just and reasonable rule and is in harmony with the natural, ordinary conduct of mankind. It should be presumed that when the president of a corporation purchases stock of the corporation paying therefor its full par value, he does so because he attaches value to the stock, and that he, being the executive officer of the corporation, will see that the stock is properly transferred upon the books of the corporation, and that this may be relied upon by the seller in the absence of knowledge which should reasonably raise a doubt in such respect."

After a very careful review of all of the authorities cited in *Cousins v. Flertzheim, supra,* and others, we are of the opinion that the statements "when the stockholder sells his stock to the president or other officer of the corporation properly indorsed in blank with power of attorney to fill in the purchaser, the officer of the corporation receives it with knowledge that the stockholder has parted with his title and that, under such circumstances, he has done all that he can do to accomplish a transfer on the books of the company," and "it should be presumed that when the president of a corporation purchases stock of the corporation paying therefor its full par value, he does so because he attaches value to the stock, and that he, being the executive officer of the corporation, will see that the stock is properly transferred upon the books of the corporation, and that this may be relied upon by the seller in the absence of knowledge which

should reasonably raise a doubt in such respect," are not supported by the decisions cited and should now be corrected. In *Whitney v. Butler, supra,* the certificates of stock there considered were delivered to the bank for transfer accompanied by a power of attorney. It was there held that "the surrender of the certificates to *the bank* and the delivery to its president of a power of attorney sufficient to effect, and intended to effect, as that officer knew, a transfer of the stock on the books of the association to the purchaser," was all that could have been reasonably done, and effected a transfer of the stock. That that case involved a delivery to the bank is entirely clear. Such delivery was the basis of that decision. *Matteson v. Dent, supra; Earle v. Carson, supra; Apsey v. Kimball, supra,* cited in the *Flertzheim Case,* and *Richmond v. Irons,* 121 U. S. 27, 7 Sup. Ct. 788; *Briggs v. Spaulding.* 141 U. S. 133, 11 Sup. Ct. 924; *Finn v. Brown,* 142 U. S. 56, 12 Sup. Ct. 136; *McDonald v. Dewey, supra.* In *Richmond v. Irons, supra,* there was involved the sale of stock by a stockholder to the president of a bank which was not transferred by him on the books of the bank. It was there held:

"By sec. 5139 of the Revised Statutes, those persons only have the rights and liabilities of stockholders who appear to be such as are registered on the books of the association, the stock being transferable only in that way. No person becomes a shareholder subject to such liabilities and succeeding to such rights, except by such transfer; until such transfer the prior holder is the stockholder for all the purposes of the law. . . . The case is not within the rule laid down in *Whitney v. Butler,* 118 U. S. 655, 7 Sup. Ct. 61. Here there is no proof, as there was in that case, of the delivery of the certificate to the bank and a power of attorney authorizing its transfer, with a request to do so made at the time of the transaction. The delivery was to Holmes, not as president, but as vendee. We are, therefore, constrained to hold that the decree below, in charging Comstock with liability as the owner of 150 shares, was not erroneous."

It is our opinion that the present controversy is ruled by *Richmond v. Irons, supra,* rather than by *Whitney v. Butler, supra,* or the law as stated in *Cousins v. Flertzheim, supra;* and we conclude that the assignment of the stock herein to the defendant, who was the president of the bank, did not operate to effect a transfer of the stock.

There is nothing in our statutes applicable to a fully organized going bank which makes it a crime to cause bank stock bought by an officer of the bank to be issued in the name of another or which makes it a crime for an officer of a bank to fail or neglect to cause stock assigned to him to be transferred on the books of the bank.

There is nothing in the record tending to show that the defendant had any sinister purpose in picking up certain stock which was either being offered for sale or which he, as president, desired to have under his control. He may well have been of the opinion, for reasons that are perfectly obvious, that it was not desirable to have stock in his bank "peddled around." He may well have thought it desirable to pick up stock, hold it in the names of others until such time as it might be disposed of to persons whose influence, loyalty, and businesses would make them desirable stockholders. The record reveals that a considerable part of the stock which had been purchased by the defendant and placed in the names of his associates was held by them for a time and was then transferred to others who became stockholders.

Our conclusions may be summarized as follows: (1) It is not an offense in this state, nor in any other state so far as we can discover, for an officer of a bank who purchases bank stock to cause it to be entered on the books of the bank in the name of another; (2) it is not an offense in this state, nor in any other state so far as we can discover, for one to whom bank stock has been assigned, to neglect or fail to have it transferred on the books of the bank; (3) when

stock is purchased by one who enters it or causes it to be entered in the name of another with the latter's knowledge and consent and the latter continues to act as a stockholder, he is, so far as the bank, the Commissioner of Banking, and the creditors of the bank are concerned and for all the purposes of the law, a stockholder and continues to be such so far as the bank, the Commissioner of Banking, and the creditors of the bank are concerned, even though he has assigned or indorsed his stock to another, until a transfer of such stock is actually made on the books of the bank, unless he has done everything that he may reasonably do to effect a transfer; (4) Marlier and the others, under the facts disclosed by the record before us, must be considered to be stockholders of the bank and therefore neither the entries in the stock register nor the statements in the reports to the Commissioner of Banking were false.

*By the Court.*—Judgment reversed, with directions to discharge the defendant.

The following opinion was filed February 19, 1934:

OWEN, J. (*dissenting*). I most emphatically dissent from that portion of the opinion which overrules the doctrine considerately and deliberately laid down in *Cousins v. Flertzheim,* 182 Wis. 275, 196 N. W. 250. As I understand the opinion herein, it is overruled because not supported by authorities. I shall enter into no controversy upon this question. Whether it is or not, is utterly immaterial. There has been no widespread judicial expression upon the subject. It is a question upon which this court has a right to think for itself, and declare such principles as it concludes to be promotive of justice under our conditions and practices. Acting in accordance with this prerogative, it most deliberately promulgated the doctrine referred to, and

stated the underlying considerations which prompted it to do so. Every member of the court, as then constituted, considered the doctrine sound. I still think so. I do not think the court, as now constituted, should overrule the doctrine because it concludes that it is not supported by ambiguous decisions of a single court. It should not overrule the doctrine unless it is promotive of injustice. I think it is promotive of justice. To permit an executive officer of a bank to buy a stockholder's stock, place it in his box where he has complete possession and dominion over it, and maintain a position where he can jump either way his interests may dictate, i. e. to transfer it on the books if and when there are dividends to collect, and maintain the *status quo* when the stockholder's liability accrues, looks to me like a trap for the unwary stockholder and an unfair advantage for the officer. It would not occur to many selling bank stock to an executive officer of the bank that he was under any duty, in order to save himself from the liabilities incident to the ownership of the stock, to cudgel the officer into the transfer of the stock on the books of the bank. Much might be written in support of the doctrine, but not much of substance would be added to the reasons which are given in the *Cousins Case*. I submit that the rule was deliberately promulgated by this court, that the reasons supporting it are fairly stated, that they are sound, that they are promotive of justice, and that no compelling or appealing reason has been given for its repudiation.