FEDERAL DEPOSIT INSURANCE CORPORATION, APPELLANT, *v.* PETERSON, RESPONDENT.

(No. 7,641.)

(Submitted March 26, 1937. Decided April 20, 1937.)

[67 Pac. (2d) 305.]

*Mr. J. E. Kelly* and *Mr. L. A. Schulz,* for Appellant, submitted a brief; *Mr. Schulz* argued the cause orally.

*Mr. J. A. Poore,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

This action was brought by the receiver of an insolvent national bank to enforce the statutory liability of a stockholder. The First National Bank of Lima was closed July 19, 1934, and the name of the defendant appeared upon the official list of stockholders as the owner of 72 shares of stock, and by reason of such showing of ownership he became prima facie liable for the assessment levied upon the stock. The complaint alleges the corporate existence of the bank, its insolvency on July 19, 1934, a resolution of the board of directors suspending and discontinuing the business of the bank, the appointment of a receiver by the comptroller of the currency, the taking of possession of the bank's assets by the receiver on the date mentioned, the levy of the assessment of 100 cents on the dollar on the stock made by the comptroller on January 23, 1935, and the failure of the defendant to pay the assessment demanded.

Defendant's demurrer to the complaint was overruled and the answer is a general denial of the allegations of the complaint, and as a "further and separate defense" defendant alleges that on the 16th day of January, 1934, the 72 shares of stock were sold to E. C. Franks, and that on the 18th day of January, 1934, the certificates of stock were regularly signed, witnessed, and delivered to the cashier of the bank with instructions to transfer the same to Franks; that Franks thereby became the owner of the stock and defendant had no further title or interest therein; and that at the time of making the sale and transfer the defendant had no knowledge of the impending failure of the

bank, or of the bank's insolvency, or its failure to meet any of its obligations.

The reply denies the allegations of the further defense contained in the answer and then alleges that on the 16th day of January, 1934, the capital structure of the bank was substantially impaired, the bank was insolvent, and that the defendant knew of such impairment and insolvency, or knew facts from which he had reason to believe that the capital structure of such bank was impaired and insolvency impending, and that the attempt to transfer the stock was fraudulently made to avoid the double liability as provided by the laws relative to national banks; that E. C. Franks was at the time of the transfer, and is now, irresponsible and unable to respond to the assessment, all of which was known to the defendant at the time of the attempted transfer. The defendant's demurrer to the reply was overruled.

The matter was tried to the court sitting with a jury. Oral and documentary evidence was introduced by both parties. When the evidence was all in, the plaintiff moved for a directed verdict, which was denied; instructions were proposed, settled, and given, and the jury brought in a verdict for the defendant; and judgment was duly entered in accordance therewith. The plaintiff's motion for a new trial was made, heard, and denied. The matter is here on appeal from the judgment.

Plaintiff assigns numerous errors which are summarized under "Questions presented," as follows:

"1. As between respondent and E. C. Franks, did the respondent make a completed transfer of his stock?

"2. As between respondent and the creditors of the bank, did the respondent do all that he was required to do to effect a transfer of the shares of stock on the books of the bank?

"3. Did respondent have knowledge of the insolvency or impending failure of the bank at the time of the purported sale of stock to E. C. Franks?

"4. On said date did respondent have knowledge of facts from which he had reason to believe the bank was insolvent or failure was impending?

"5. Was transferee insolvent?"

We think plaintiff's "questions presented" may be reduced to one which we believe decisive of the action. Other questions explanatory in nature will be considered, but are not essential to the determination of the controversy.

It is our view that the one decisive question is: Did the agreement between Peterson and Franks, and what Peterson did to have the stock transferred on the books or the bank's record of stockholders, operate to relieve Peterson of his double liability as a stockholder? If Peterson's deal with Franks will stand the test fixed by section 64, Title 12, U. S. C. A., Peterson avoids liability, otherwise not. Section 64 provides:

"The stockholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, each to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock. The stockholders in any national banking association who shall have transferred their shares or registered the transfer thereof within sixty days next before the date of the failure of such association to meet its obligations, or with knowledge of such impending failure, shall be liable to the same extent as if they had made no such transfer, to the extent that the subsequent transferee fails to meet such liability; but this provision shall not be construed to affect in any way any recourse which such shareholders might otherwise have against those in whose names such shares are registered at the time of such failure."

The cashier testified that when Peterson presented the stock at the bank January 18th for transfer, he told Peterson that Franks was in the day before and told the cashier to advise Peterson when he came in that he, Franks, would not take the stock. Peterson denied the cashier gave him any such advice. If the testimony of the cashier is credited, there was no executed contract of sale and Peterson remained the owner of the stock; and we are further of opinion for reasons which we will hereafter give, that whether the cashier gave such advice to Peter-

son or not is immaterial. If the testimony of Peterson prevails over that of the cashier, then we must abandon our "one vital question" and advance to and determine the further question as to whether Peterson, in the language of section 64, transferred his stock "with knowledge of impending failure of the bank." Before proceeding along the lines indicated, certain other questions bearing upon the controversy will be disposed of.

A stockholder in a national bank transferring stock within ▮ sixty days prior to the failure of the bank is in the same position as though no transfer had been made. (*Wehby* v. *Spurway*, 30 Ariz. 274, 246 Pac. 759, certiorari denied 273 U. S. 722, 47 Sup. Ct. 112, 71 L. Ed. 858.) Stockholders' liability continues for sixty days after transfer in any event. (*Fletcher* v. *Porter*, (C. C. A.) 20 Fed. (2d) 23, affirming *Farrell* v. *Fletcher*, (D. C.) 14 Fed. (2d) 204.) Such liability is primary, and the receiver need not exhaust remedies against the transferee. (*Collins* v. *Caldwell*, (C. C. A.) 29 Fed. (2d) 329.) A stockholder transferring stock more than sixty days before failure is not liable if the transfer is made in good faith and it is not shown that he was chargeable with knowledge of impending failure. (*Hodges* v. *Meriwether*, (C. C. A.) 55 Fed. (2d) 29, 86 A. L. R. 52; *Zdunek* v. *Thomas*, 215 Wis. 11, 254 N. W. 382.)

Plaintiff alleges Peterson's transferee to be insolvent and financially irresponsible, and Franks admitted his insolvency on the witness stand, and no further consideration need be given to that question. Franks' alleged incapacity to contract by reason of intoxication at the time of his agreement to purchase the stock from Peterson has no bearing on Peterson's liability here, in our opinion.

Returning now to the agreement between Peterson and Franks. It may be assumed that, as between the parties, the agreement made the evening of January 16, 1934, was a binding contract of sale. (*Polich* v. *Severson*, 68 Mont. 225, 216 Pac. 785; *Koerner* v. *Northern Pac. Ry. Co.*, 56 Mont. 511, 186 Pac. 337.) But it is an executory contract. (*Box Elder Livestock Co.* v. *Glynn*, 58 Mont. 561, 193 Pac. 1117; 13 C. J. 245;

6 R. C. L., sec. 9, p. 590.) Peterson's certificates of stock were in a Dillon bank and could not be delivered until he got them, made the indorsement, had his signature witnessed, and delivered the certificates to the cashier of the Lima bank for transfer to Franks. Until these things were done by Peterson, the contract retained its executory character. (*Lewis* v. *Lambros,* 58 Mont. 555, 194 Pac. 152.) The contract was agreed upon January 16, 1934; Franks repudiated the agreement January 17, 1934, which he was at liberty to do. (*Herrin* v. *Scandinavian-American Bank,* 65 Wash. 569, 118 Pac. 648.) Section 7565, Revised Codes, cited by defendant, does not apply here, as that section enumerates circumstances in which one may rescind without liability. No one can be prevented from breaching any contract, but may be held liable when he rescinds without legal justification. Peterson did not indorse and deliver the stock to the cashier of the bank until January 18. Peterson, of course, had a right of action against Franks for breach of contract, but Peterson could not compel Franks to accept the stock. Peterson's name was on the bank's record of shareholders as the owner of the 72 shares on January 18, 1934; he failed in his attempt to sell and have the stock transferred, and, as a matter of law, remained the owner up to and on July 19, 1934, when the bank was declared insolvent by the comptroller of the currency and the receiver appointed.

National bank stock, as regards the stockholder's liability, presumably belongs to the one in whose name the shares stand on the books of the bank. (*Schlener, Receiver,* v. *Davis,* (C. C. A.) 75 Fed. (2d) 371, 99 A. L. R. 498; 7 R. C. L., pp. 264–266, sec. 243; *Richmond* v. *Irons,* 121 U. S. 27, 7 Sup. Ct. 788, 30 L. Ed. 864; *Matteson* v. *Dent,* 176 U. S. 521, 20 Sup. Ct. 419, 44 L. Ed. 571; *Rankin* v. *Fidelity Ins. Trust & Safe Deposit Co.,* 189 U. S. 242, 23 Sup. Ct. 553, 47 L. Ed. 792; *Forrest* v. *Jack,* 294 U. S. 158, 55 Sup. Ct. 370, 79 L. Ed. 829, 96 A. L. R. 1457; *McClaine* v. *Rankin,* 197 U. S. 154, 25 Sup. Ct. 410, 49 L. Ed. 702, 3 Ann. Cas. 500; *Christopher* v. *Norvell,* 201 U. S. 216, 26 Sup. Ct. 502, 50 L. Ed. 732, 5 Ann. Cas. 740;

*United States ex rel. Citizens' Nat. Bank* v. *Knox*, 102 U. S. 422, 26 L. Ed. 216; *Keyser* v. *Hitz*, 133 U. S. 138, 10 Sup. Ct. 290, 33 L. Ed. 531; *McDonald* v. *Thompson*, 184 U. S. 71, 22 Sup. Ct. 297, 46 L. Ed. 437; *Whitney* v. *Butler*, 118 U. S. 655, 7 Sup. Ct. 61, 30 L. Ed. 266.)

Defendant contends that when Peterson indorsed his stock ▇ and presented it to the cashier for transfer to Franks, Peterson had done all that was incumbent upon him to do in the premises, and that he therefore and from that time ceased to be a stockholder. Assuming, for the sake of argument, that the question of good faith and lack of knowledge of impending failure of the bank on the part of Peterson be not involved, we agree that defendant's contention is within the general rule, but for the reason heretofore stated the contract by which Peterson expected to dispose of his stock had been repudiated, and, instead of consummating an executory contract of sale, he was reduced to a right of action against the party to whom he hoped to make the sale.

It might be contended that the conflict in the testimony on the question as to whether the cashier advised Peterson of Franks' repudiation of the contract before the stock was delivered to the cashier January 18, being a question of fact, the verdict of the jury in favor of Peterson forecloses our right to review such question. We think it immaterial whether the cashier so advised Peterson or not. Peterson testified that he told Franks when he sold him the stock on January 16 that the stock certificates were in Dillon and that he would get them and have them at the Lima bank within two days. Peterson made the bank his agent to consummate the transaction, and when Franks advised the bank on January 17 he would not take the stock it was advice to Peterson. Hence, the executory contract of sale between Peterson and Franks was never consummated, and Peterson was the registered owner and the owner in law July 19, 1934, and liable for the assessment.

Even if we go beyond the question of law which, as we have just stated, we think is determinative of the controversy, and

consider the matter from the standpoint of Peterson's contentions of good faith and lack of knowledge of the impending failure of the bank and determine the cause on questions of fact, we find Peterson in no better position to resist the assessment.

Immediately after the meeting of the stockholders and directors on January 16, 1934, later adverted to, Peterson made the deal by which he sold his stock of the par value of $7,200 to Franks for $1, and loaned Franks the $1 to pay the purchase price. It appears that later in the evening Franks obtained $1 from his wife and made good his loan due Peterson of $1. Gentry, the national bank examiner, testified that just after his examination of the bank on November 14, 1933, there was a meeting of the directors and stockholders of the bank, at which he advised them that certain things must be done to put the bank in a satisfactory financial condition; that the capital stock was impaired and an assessment was necessary. Gentry's testimony was in part as follows: "The directors were willing to make a voluntary contribution provided they would be relieved of further liability in connection with their holdings of the capital stock of the First National Bank of Lima. I was questioned as to their status. I am referring now to their status in the event they made such a contribution. The directors had in mind some recovery in the event the bank failed or was placed in liquidation. I informed them that their individual stockholder's liability would carry on in accordance with the law whether they did or whether they did not make any contribution at that time. There was also a discussion as to the procedure in making a formal assessment against the capital stock. I inquired as to the possibility of the stockholders paying their share in full in case of a formal assessment. It was my determination at that time and theirs also that it was impossible. It was determined that a certain number of the shareholders were without means and could not possibly pay their liability which might be enforced under an assessment on the capital stock. The directors were informed then that if such an assessment were levied and some one did not buy in the capital stock of the

non-paying shareholders, the bank would be forced into liquidation or receivership by reason of non-payment, non-restoration of the capital stock. * * * It was suggested also that some consideration might be given to a plan for ten thousand dollars, or thereabouts, contribution on the part of the bank directors, paying shareholders, to remove certain defined losses and to sell an issue of preferred stock to the Reconstruction Finance Corporation sufficient to cover the losses in the asset structure of the bank that would remain. The matter rested there for that meeting. It was followed up later. In this discussion that I have just referred to, Mr. John Peterson, the defendant in this action, made the same statement that the other directors made at that time with reference to assessments and the effect of assessments and his willingness so to do and what he was willing to do. Mr. Peterson made the statement that he was not willing to contribute a sum equal to the par value of his stock and still be liable for a full one hundred per cent.''

Mr. F. M. Merrell, a merchant of Lima, a stockholder and former president and director of the First National Bank of Lima, testified in part, in referring to the meeting of November 14, 1933, as follows: ''We asked Mr. Gentry as to what would be the situation if we raised $14,000 to help the bank out and then the bank went into liquidation, as to whether we would get this money back in preference to the other stockholders, and Mr. Gentry told us that we would not. Mr. Gentry told us that if we raised this money by an assessment and then the bank had to close, it would be practically the same as a donation. Mr. Peterson was present and took part in this discussion with the rest of us. When we were discussing the question of paying a voluntary assessment, Mr. Peterson said he would be willing to pay an assessment if we would close the bank and have no further assessments at all, close the bank up and that would be the end of it. He wanted us to close it up so that there would be no way for them to come back on us for any more money. I was also present at a meeting which was held on January, 1934. This was a stockholders' meeting which was followed by a di-

rectors' meeting. I was present at both meetings. Mr. John Peterson, the defendant, was also present at those meetings. * * * We were talking over the condition and how to keep the bank going. As I remember, there was an amount fixed as to the amount of slow paper we had. While I could not say for certain, but I would say it was about twenty-two thousand dollars' worth of slow paper. [It is obvious the witness intended to include in this the reductions to be made in the bank building, furniture and fixtures account.] * * * At the stockholders' meeting Mr. W. B. Gleed, Mr. James Pierce, Mr. John Peterson and myself were elected directors. I do not recall who the other director was. I was present at the directors' meeting during all the time the meeting was in progress. Mr. Peterson stated at that time that he was going to get rid of his stock, that he didn't want his stock any longer. * * * I was also present at a meeting held on January 23rd, which would be about one week after the directors' meeting about which I just testified. At this meeting on January 23rd I believe all the directors were present. Mr. John Peterson was present at that particular meeting. At this last named meeting we talked over the general condition of the bank like we did at the other meetings. * * * And we also read the correspondence that pertained to the weakness of the bank. At that time in order to attempt to secure aid for the bank we wrote the President of the United States a letter. * * * This letter which you now hand me marked Plaintiff's Exhibit No. 17 for the purpose of identification is a photostatic copy of the letter that was signed at this meeting that I refer to on January 23rd. I am not so very familiar with the signature of John Peterson. This signature signed on Exhibit No. 17 for the plaintiff for identification I would recall the signature of John Peterson. I could not recall of Mr. Peterson signing this letter in my presence.''

The foregoing testimony of the bank examiner Gentry and of director Merrell of the bank, and the testimony of others to substantially the same effect, we think shows conclusively that the board of directors of the bank, including the defendant Peter-

son, were cognizant of the fact that the bank was in a bad condition, its solvency in serious doubt, and its failure impending.

The question of adjusting the unsatisfactory affairs of the bank continued to be the chief concern at each meeting of the officials of the bank following the meeting of November 14, and the defendant was present and participated in the meeting of January 23, several days after he alleges in his pleadings and contends in his testimony that he had ceased to be a stockholder in the bank. It is quite clear from this act that Peterson believed he still owned the 72 shares of stock.

It will be noted that section 64 of the National Banking Laws (12 U. S. C. A.) heretofore recited, provides in part that stockholders who have transferred their stock "with knowledge of such impending failure, shall be liable to the same extent as if they had made no such transfer."

That Peterson attempted to transfer his stock to escape the double liability of a stockholder is too clear from the evidence in the record to admit of doubt. Peterson did not make the sale to Franks of $7,200 worth of stock in order to gain the $1 he received from Franks, but to avoid the liability that attached to ownership of the stock. If Peterson held a worthless note having a face value of $7,200, he would have incurred no risk in holding it the rest of his life, and if he had then bequeathed it to another, its ownership would have brought to the holder no liability, but, being bank stock subject to the double liability provisions, it was a menace to his financial welfare, and a thing to be rid of. This fear of financial loss was the one and only prompting motive that led to the attempted transfer. Peterson clearly anticipated that the bank stock was a liability when, at the November, 1933, meeting, he advised the liquidation of the bank and his willingness to pay his part of existing liabilities. His expressed willingness to pay his part of the bank's liabilities at that time was nothing more than he is asked to do by this action, and there is no showing in the record that the bank's condition was materially worse July 19, 1934, than it was November 14, 1933.

It was said in *Jeffreys* v. *O'Neal*, (C. C. A.) 64 Fed. (2d) 284, that the "statute [section 64, above] * * * must be given reasonable interpretation and one has knowledge of impending failure of bank if he has knowledge or reasonable grounds to believe that it is insolvent." To say that Peterson had no knowledge or reasonable grounds to believe that the bank was insolvent is beyond the realm of common sense and reasonable comprehension. (See *McDonald* v. *Dewey*, 202 U. S. 510, 26 Sup. Ct. 731, 50 L. Ed. 1128, 6 Ann. Cas. 419; *Cox* v. *Montague*, (C. C. A.) 78 Fed. 845.) In the last mentioned case it was said the transferor need not have actual knowledge of the insolvency of the bank at the time of the transfer, but it is sufficient if he had good ground to apprehend its failure and made the transfer to relieve himself from liability. The jury had no evidence before them, substantial in character, that justified a verdict on the assumption that Peterson had no knowledge from which he might reasonably apprehend the bank's failure.

The trial court should have granted the plaintiff's motion for a directed verdict. The judgment is, therefore, reversed and the cause remanded with instructions to enter judgment for plaintiff.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART, ANDERSON and ANGSTMAN concur.